KARREN KENNEY, CA. SBN 174872
KENNEY LEGAL DEFENSE CORPORATION
575 ANTON BLVD., SUITE 300
COSTA MESA, CA 92626
TELEPHONE: (855) 505-5588
E-MAIL: KARREN.KENNEY@GMAIL.COM

Attorney for Plaintiff/Movant *John Bauché*

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE THE RETURN OF SEIZED PROPERTY, specifically all funds seized from BoundlessRise, LLC Wells Fargo Bank Account number \*\*\*\*\*\*9784 | 8:17-cv-00771<br>Case No. ████████<br><br>Related Case No.: SA 16-542M<br><br>**COMPLAINT/MOTION FOR RETURN OF PROPERTY AND REQUEST FOR EVIDENTIARY HEARING; DECLARATION OF KARREN KENNEY**<br><br>HEARING DATE:<br>HEARING TIME: |

Plaintiff/Movant, John Bauché, by and through his attorney of record, Karren Kenney, hereby files this Complaint and Motion for Return of Property pursuant to Federal Rules of Criminal Procedure 41(g). This motion is based upon the attached memorandum of points and authorities, the declaration of Karren Kenney, the attached exhibits, the files and records in this case, and any additional evidence and argument as may be presented at the hearing of the motion.

DATED: May 1, 2017

/s/ *Karren Kenney*
KARREN KENNEY
Attorney for Plaintiff/Movant

1

## I.  INTRODUCTION

Pursuant to Federal Rule of Criminal Procedure 4l(g) and 18 U.S.C. § 983(a)(3)(B), Plaintiff/Movant Bauché as the sole principal of BoundlessRise, LLC, ("BoundlessRise") submits the following memorandum in support of his Complaint and a motion for the return of all monies wrongfully seized on November 28, 2016.

## II.  STATEMENT OF RELEVANT FACTS

On November 28, 2016, FBI Agent Jessie Murray signed an Affidavit in support of a Seizure Warrant under penalty of perjury and submitted it to Magistrate Judge Jay C. Ghandi requesting seizure of "all funds on deposit in Wells Fargo Bank Account Number ******9784", a BoundlessRise, LLC account. (See **Exhibit 1** Application and Affidavit for Seizure Warrant Case Number SA16-542M).    In her affidavit Murray claimed the funds were subject to seizure and forfeiture concerning violations of 18 U.S.C. sections 1341, 1343 and 1956.  To date there has been no criminal indictment issued for any criminal charges against Mr. Bauché.

Prior to the unlawful seizure, a Masimo employee discovered Mr. Bauché was the principal of BoundlessRise.  Instead of questioning Bauché about his affiliation with BoundlessRise the company hired former colleagues of FBI agent and affiant Jessie Murray, former FBI agents Bonin and Norell, to investigate his affiliation.  On July 20, 2016, Bonin and Norell proceeded to confront, interrogate, threaten and force Bauché to go to a Wells Fargo branch to withdraw and pay money they believed was owed to Masimo.  Norell and Bonin followed Mr. Bauché to Wells Fargo Bank where Norell waited outside and Bonin followed Bauché into the bank.  During the forced withdrawal, Bonin stood behind Bauché and paced back and forth.  After Bauché was forced to turn over the funds, he was terminated by Paul Bonin, NOT A MASIMO EMPLOYEE FROM

HUMAN RESOURCES.  This termination happened at a Starbucks in Mission Viejo, where Bonin provided Bauché with the Masimo termination paperwork and his final paycheck.

On November 28, 2016, the government unlawfully seized BoundlessRise Wells Fargo bank account number ******9784 as a result of a seizure warrant pursuant to 18 U.S.C. section 981.  John Bauché is the sole principal of BoundlessRise, LLC.  The Seizure Warrant was based on inaccurate and false second hand information that was provided to FBI Agent Jessie Murray, through FBI Agent Brad Howard, believed to have originated from 2 former FBI agents Agent Murray and Howard previously worked with, now private investigators, Paul Bonin and Peter Norell of Norell Investigations.  (Note: Peter Norell was fired by the FBI and suspended by the State Bar of California for unlawful conduct he engaged in during the course and scope of his employment as an FBI agent).

On December 12, 2016, FBI Agent Murray notified counsel formal notices would be sent out within 60 days of the seizure.  The 60 day time period expired on January 27, 2017.  Although no formal notice of the unlawful seizure was ever provided to Mr. Bauché, counsel for Bauché was proactive and served a Claim via email to FBI Agent Murray on December 20, 2016.  To date, there have been no formal notices sent by any government agency to Mr. Bauché regarding the seizure.  A civil forfeiture action has not been filed and a criminal indictment has not been obtained.  Under the instant motion, Bauché seeks return of the unlawfully seized property.   The government is not entitled to hold the BoundlessRise Wells Fargo bank account funds indefinitely while it searches for some basis that could possibly justify the seizure. The government has blown past the mandatory 90-day deadline established by the Civil Asset Forfeiture Reform Act of 2000 ("CAFRA"), 18 U.S.C. § 983(a)(3)(A), for initiating forfeiture proceedings.

Congress has established a clear remedy for that failure: the property must be returned. See 18 U.S.C. § 983(a)(3)(B).

Ms. Murray stated her November 28, 2016 affidavit was based upon "personal knowledge and belief". She then qualified her statement stating her "belief" was from information she obtained from FBI agent Brad Howard. Brad Howard does not have any personal knowledge of the circumstances surrounding Mr. Bauché's employment with Masimo, and it is believed he received false information from fired and retired FBI Agent Peter Norell of Norell Investigations.

Peter Norell of Norell Investigations is a private investigator hired by Masimo to look into the circumstances surrounding Mr. Bauché's employment. During his investigative efforts, Mr. Norell engaged in unlawful conduct resulting in Mr. Bauché's termination. After this conduct, he then abused his persona contacts that he has with Agents Murray, Howard, and Assistant United States Attorney Greg Staples (who is apparently assigned to the investigation), in order to try to obtain criminal charges against Mr. Bauché. It is obvious Mr. Norell used his prior FBI contacts with his former colleagues, FBI Agent Brad Howard and FBI Agent Jessie Murray and Assistant United States Attorney Greg Staples to accomplish the unlawful seizure of the bank account in question. Attached hereto as **Exhibit 1** and incorporated herein by reference is a collection of letters submitted to Judge Guilford for Peter Norell's criminal case number SACR10-0046, which include reference letters signed by Murray, Howard, and AUSA Staples. It also includes a letter signed by former FBI Agent Paul Bonin who also is involved in the unlawful seizure. From these letters it is crystal clear that Norell used his relationships with Murray, Howard and Staples to get wrongful criminal charges filed against Bauché.

## MISREPRESENTATIONS AND FALSE INFORMATION IN SEIZURE
## WARRANT AFFIDAVIT

The Seizure Warrant Affidavit submitted by Jessie Murray contains the following misrepresentations and false information the magistrate was provided and relied on in issuing the seizure order which is attached hereto as **Exhibit 2** and incorporated herein by reference. Bauché is requesting a formal evidentiary hearing to address the false statements and misrepresentations made to the magistrate judge that led to the seizure.

**Paragraph No. 6:**

Alleges "BAUCHÉ created a shell company BoundlessRise and promoted it as the best outside marketing vendor to and for his employer, when in fact the outside marketing vendor was BAUCHÉ'S own company." This is completely false. BoundlessRise was created in 2014 as a legitimate marketing and consulting business that had more than 30 clients, including Masimo. Mr. Bauché never held a position of influence while employed at Masimo and had no authority to approve vendors nor sign-off on BoundlessRise invoices. All decisions had to be approved by many layers of Masimo Management that were superior to Mr. Bauché, including Directors, Vice Presidents, and C-Suite. Mr. Bauché had no authority and took no part in the accounting and payment processes for Masimo. He had nothing to do with paying vendors, getting the necessary approvals, nor routing invoices for sign-off. Any advice given by Mr. Bauché was opinion based and could not have influenced management to act solely as his position was one of little power and influence. The people needed to approve such decisions would have been part of the approval process for selection and payment of any vendor, including BoundlessRise. Mr. Bauché never had any authority to make vendor or financial related decisions on behalf of the company, nor was he a fiduciary of the company.

The Affidavit further alleges "BAUCHÉ created false invoices." This is also false. Real invoices were created for legitimate work that was completed for approved keywords from Masimo Management that were ranked for using global Search Engine Optimization (SEO) strategies and techniques. Attached as **Exhibit 3** is a sample of the masimo.com SpHb Search Engine Optimization (SEO) Keyword reports for work completed by BoundlessRise around the SpHb technology product group, one of many groups that global SEO work was completed by BoundlessRise.

In addition, the Affidavit alleges: "The **investigation revealed** that BAUCHÉ engaged in mail fraud, wire fraud, and money laundering in the Central District of California in connection with the fraud scheme he operated." At the time the account was seized, the investigation was not even completed and to date, a criminal indictment has not been obtained. These bold conclusory statements are not supported by any competent, reliable evidence.

**Paragraph 7:**

Alleges "BAUCHÉ was hired as a marketing employee in March 2013 by Masimo". Again, this is false. Mr. Bauché was hired under the Public Relations/Marketing Communications Department on April 1, 2013 as a "Social Media Strategist/Online Community Specialist." Attached as **Exhibit 4** is a true and correct copy of the Masimo Employment Offer Letter to Mr. Bauché dated March 15, 2013, Social Media Strategist Online Community Specialist Job Description and the Masimo Organization Chart as of July, 2014. Masimo is a medical technology company that develops and manufactures medical devices and sensors. Bauché's position with Masimo did not include any job responsibility for global SEO services.

/ / /

**Paragraph 8:**

Alleges: "In 2014, Masimo hired an outside marketing vendor, BOUNDLESS RISE, for search engine and website optimization. BAUCHÉ falsely represented to Masimo that BOUNDLESS RISE was the best search engine optimization vendor for Masimo." As previously stated, Mr. Bauché had no authority to decide and approve which vendors were used. Masimo Management decided and approved all the vendors it employed.

Further alleged is "BAUCHÉ failed to tell Masimo that BOUNDLESS RISE was BAUCHÉ's own company, a fact that would have been material to Masimo." Prior to Mr. Norell's and Mr. Bonin's bullying tactics, Mr. Bauché was never asked by anyone from Masimo if BoundlessRise was his company and he did not violate any federal criminal law by failing to offer the information. Again, the decision was made by Masimo Management to utilize BoundlessRise as Mr. Bauché had absolutely no authority, nor influence in his position to make any decision on behalf of Masimo. Mr. Bauché was not a fiduciary of this company and it was Masimo's responsibility to do its own due diligence. It was a matter of public record that Mr. Bauché was and is the principal of BoundlessRise.

**Paragraph 9:**

Alleges: "In July 2016, a Masimo employee discovered that BAUCHÉ was the domain registrant for BOUNDLESS RISE. Further investigation by Masimo revealed that BOUNDLESS RISE was incorporated in February 2014 in Wyoming by BAUCHÉ, using the same phone number and e-mail address listed in his employment application with Masimo. Additionally, the BOUNDLESS RISE LLC Annual Report, dated March 11, 2015, was found to have been signed by BAUCHÉ." This information was publicly

available and downloadable from the internet.  This proves Mr. Bauché was not hiding his affiliation with BoundlessRise, which he could have easily done by using fake names.

**Paragraph 10:**

Alleges: "Masimo began receiving invoices from BOUNDLESS RISE on March 24, 2014. The invoices were paid by check, and Masimo mailed the checks to BOUNDLESS RISE's office, located at 220 Newport Center Drive, Suite 11-211, Newport Beach, CA. A total of $761,675 in checks from Masimo, made payable to BOUNDLESS RISE, was deposited into Account No. '9784."  These invoices were for Search Engine Optimization work performed by BoundlessRise which were approved and signed-off on by Masimo Management.  The global SEO services performed included the following Masimo website properties:   Masimo.com, Masimo.co.uk, Masimo.fr, Masimo.it, Masimo.de, Masimo.es, MasimoPersonalHealth.com, MasimoPersonalHealth.co.uk. Multiple levels of Masimo Management authorized and signed-off on all global SEO work performed and the respective invoices. Mr. Bauché did not approve, sign, nor authorize anything.  See attached **Exhibit 5** which is an example of how many levels of Masimo Management were required to sign-off on one simple invoice.

**Paragraph 11:**

Alleges: "On July 20, 2016, BAUCHÉ was interviewed by Investigators Pete Norell and Paul Bonin, from Norell Consulting, Inc. ("Norell"). During the interview, BAUCHÉ admitted that he incorporated a shell company".  This is completely false. BoundlessRise was and still is a legitimate company that serviced several clients, including Masimo, during the time Mr. Bauché was employed with Masimo.  The fact that Jessie Murray admits neither Brad Howard nor she had any personal knowledge of the circumstances surrounding Mr. Bauché's employment with Masimo, the Affidavit was clearly based upon multiple levels of hearsay.  Hearsay that is completely unreliable

given Mr. Norell's history of being fired from the FBI which led to criminal charges against him.

Paragraph 11 further alleges: "BOUNDLESS RISE, created false invoices under the name of BOUNDLESS RISE, and submitted the invoices for payment to Masimo." These assertions are also false. There were no invoices submitted to Masimo that were fake or false. All invoices submitted were for actual work completed as proved by all the reports and global Search Engine Optimization results obtained for the company.

Paragraph 11 also alleges "BAUCHÉ claimed that he employed Virtual Group, a company in the Philippines, to do all of the search engine optimization work." This is also a misrepresentation. Virtual Group was just one of the companies that BoundlessRise utilized for outsourced work. Prior to Virtual Group, BoundlessRise outsourced work to EndlessRise, who was later acquired by Virtual Group. In addition, BoundlessRise had independent contractors on a full-time basis to complete work for Masimo as well as work for other BoundlessRise clients. These freelance contractors were hired from well-known outsourcing websites including but not limited to: OnlineJobs.ph, Fiverr.com, UpWork.com, Elance.com, Freelancer.com, Odesk.com, Brickwork India etc. Anyone who actually is familiar with White Label SEO companies knows they provide reseller rights to SEO businesses like BoundlessRise, including EndlessRise and Virtual Group. Outsourcing to White Label SEO companies is a common practice that many businesses engage in to help with work which only benefits the client, like Masimo. BoundlessRise paid for outsourcing via credit card transactions through Paypal and American Express. Attached as **Exhibit 6** is a sample of the credit card transactions for outsourcing through Paypal and American Express showing payment to BoundlessRise vendors, contractors, and other outsource websites for work completed.

"BAUCHÉ provided the Norell investigators with an invoice dated June 30, 2016 for $15,781 from Virtual Group. BAUCHÉ admitted that BOUNDLESS RISE did none of the work. BAUCHÉ, through BOUNDLESS RISE, marked up the Masimo invoices 25%, keeping the markup and paying Virtual Group the amount owed." This statement in the Affidavit is not true. As stated before, the unreliability of information former fired FBI Agent Norell provided to his friends, FBI Agents Murray and Howard, can't be disputed considering his pattern of bullying and lying in past instances that was documented in United States Attorney's Office sentencing position filed in Peter Norell's criminal case. Attached as **Exhibit 7** is a copy of the efiling in case number SACR 10-00046, specifically the Declarations of Agent Quigley and Takefman (without referenced attachments).

Further alleged in Paragraph 11: "BAUCHÉ said he used some of the funds to buy an investment property in Lake Forest, CA." This is absolutely false. Money from a 1031 Tax Exchange was the sole funding of Mr. Bauché's investment property in Lake Forest. See attached **Exhibit 8** Coastal 1031 Inc. 1031 Tax Exchange Agreement 2014-09-10 and City National Bank 1031 Tax Exchange Wire Transfer 2014-09-12.

**Paragraph 12:**

Alleges: "BAUCHÉ further admitted to the Norell investigators that he believed there was $30,000 to $40,000 still left in Account No. '9784. BAUCHÉ admitted that these funds belonged to Masimo and agreed to go to Wells Fargo and provide the Norell investigators with the funds remaining in the account." This is also not true. Peter Norell bullied, forced and threatened Bauché to drive to the bank and withdraw money even though this money legally belonged to BoundlessRise for work that was done for Masimo.

**Paragraph 15:**

Paragraph 15 alleges: "On July 28, 2016, a representative of Virtual Group stated it had issued only had one invoice to BOUNDLESS RISE for work done for Masimo. The invoice was dated July 9, 2014, and was in the amount of $6,813.75." Although this statement is true, Jessie Murray left out material information, EndlessRise was acquired by Virtual Group with the majority of SEO work having been completed and outsourced to EndlessRise.

Also, Masimo admitted to being in possession of 2 invoices, not just one, as evidenced in the California Unemployment Insurance Appeals Board hearing that was held on October 31, 2016 during which sworn testimony was taken.

**Paragraph 16:**

Paragraph 16 alleges: "Aside from the single referenced Virtual Group invoice, there was no additional marketing work done by an outside marketing vendor for Masimo." As stated under Paragraph 15, Masimo presented 2 invoices during the referenced hearing. There was an enormous amount of global SEO work completed by BoundlessRise for Masimo. Search Engine Optimization is a very complex line of work. BoundlessRise, through EndlessRise/Virtual Group, contract employees, and various freelance website vendors provided full-time services to BoundlessRise which benefitted Masimo's global website rankings.

Paragraph 16 further alleges: "Any marketing work done by BAUCHÉ was performed as part of his duties as a marketing employee for Masimo." Again, this is false. Mr. Bauché was not hired as a marketing employee for Masimo. Bauché was hired under Public Relations and Marketing Communications Departments at Masimo, but no job responsibilities at Masimo included Search Engine Optimization work. See attached **Exhibit 3** as discussed previously.

**Paragraph 17:**

Paragraph 17 alleges: "On July 20, 2016, BAUCHÉ made a withdrawal from Account No.'9784 (the account containing the SUBJECT FUNDS) in the amount of $27,000 (which was used to fund the cashier's check to Masimo). On the same day, BAUCHÉ transferred $710,000 to Wells Fargo Bank Account No. '9058 (Account No. '.9058 Account), in the name of Skyward Investments LLC (another company owned by BAUCHÉ). The transferred funds represented payments to BAUCHÉ by Masimo, which was the sole funding source for Account No. '9784." These are misrepresentations. The monies in the BoundlessRise account for work performed for Masimo and other clients.

**Paragraph 19:**

Paragraph 19 alleges: "On November 23, 2016, the current balance in Account No.'9784 (the account containing the SUBJECT FUNDS) was $642,643.71. BAUCHÉ's transfer of funds between the two accounts was an attempt to conceal and disguise the nature, location, and source of the SUBJECT FUNDS, which represent proceeds of the mail fraud and wire fraud." This is false. The funds were derived from approved legitimate transactions for work completed. Mr. Bauché was under no legal obligation to turn over any of his business funds to former fired FBI agent Norell of Norell Investigations.

### III.   ARGUMENT

"When a motion is made under Rule 41(g) of the Federal Rules of Criminal Procedure by a party against whom no criminal charges have been brought, such a motion is in fact a petition that the district court invoke its civil equitable jurisdiction." *Ramsden v. United States*, 2 F.3d 322, 324 (9th Cir. 1993). Since the unlawful seizure

in this case, the government has failed to file civil forfeiture proceedings or obtain a criminal indictment.

In deciding a Rule 41(g) motion, the court balances the equities between the Plaintiff and Government's needs for the seized property. There must be a danger of irreparable injury to the movant, stemming from waiting for a remedy rather than from the original seizure, and the movant must have no adequate remedy at law. In the Ninth Circuit the following four factors are considered: "1) whether the Government displayed a callous disregard for the constitutional rights of the movant; 2) whether the movant has an individual interest in and need for the property he wants returned, 3) whether the movant would be irreparably injured by denying return of the property, and 4) whether the movant has an adequate remedy at law for the redress of his grievance." *Id.* at 325. The availability of this procedural mechanism ensures that the government may not hold seized property indefinitely without commencing judicial.

Given the amount of time that has elapsed since the government seized the funds, and absolutely not action being taken by the government in terms of civil forfeiture or a criminal indictment, the government's continued possession of the funds violates not only the timelines established by CAFRA, but also the Due Process Clause of the Fifth Amendment. CAFRA and due process demand the property be returned immediately.

**A. The Balancing of the *Ramsden* Factors Warrant Return of the Funds.**
The Government Exhibited Callous Disregard for the Constitutional Rights of Mr. Bauché

The Government's conduct has been sufficiently reprehensible and warrants return of the funds unlawfully taken. By the mere fact that FBI Agent Murray was able to obtain a seizure warrant based upon multiple levels of hearsay and absolutely no personal knowledge does not on its face legitimize the government's actions. The

Affidavit submitted to the magistrate for the warrant was filled with misrepresentations and false information. Had the magistrate been told the truth, the warrant would have never been obtained.

Bauché Has an Interest In and Immediate Need for the Funds

Mr. Bauché is in immediate need of the funds in order to file and pay taxes. After taking care of his tax obligations, he will then be able to proceed with obtaining citizenship.

Bauché would be irreparably injured if the funds are not returned

If Mr. Bauché is not allowed to have the funds to pay his tax obligations and then proceed with obtaining citizenship, he may never have the opportunity to obtain citizenship in the future.

No Other Adequate Remedy at Law Exists

The government has unlawfully seized the funds, leaving Mr. Bauché the only remedy to seek return of the money view this motion because the government failed to proceed with forfeiture proceeds.

**B. The Government Has Violated the Deadlines Set by CAFRA and Is Therefore Obligated to Return the Funds.**

While CAFRA included numerous reforms intended to prevent abuse of the forfeiture laws, the most sweeping change enacted by the law was the creation of strict deadlines that the government must follow when initiating forfeiture proceedings. See 18 U.S.C. § 983(a). Congress also was quite clear about the appropriate remedy if the government failed to comply with the statutory deadlines: "[T]he Government shall promptly release the property." 18 U.S.C. § 983(a)(3)(B)(ii) (emphasis added). Under CAFRA, there can be no question about the proper resolution of this case. The government has not complied with the deadlines established by Congress, and thus

must be ordered to return the money. CAFRA carefully sets forth a series of deadlines that apply to both civil and criminal forfeiture proceedings. Following a seizure, the government has 60 days to either send "written notice to interested parties" of a "nonjudicial civil forfeiture proceeding," commence "a civil judicial forfeiture action," or "obtain a criminal indictment containing an allegation that the property is subject to forfeiture." 18 U.S.C. § 983(a)(l). The government has not complied with any of these deadlines.

If the government allows the 90-day period to lapse without either commencing civil or criminal forfeiture proceedings, CAFRA provides that "the Government shall promptly release the property." Id. (emphasis added). In this case, the government has long since passed that 90-day deadline without taking any action to commence civil or criminal forfeiture proceedings. The remedy for the government's extraordinary course of conduct is plainly spelled out by Congress in CAFRA and should be ordered without delay: "[T]he Government shall promptly release the property." 18 U.S.C. § 983(a)(3)(B).

Here, where the government has threatened criminal forfeiture but has not even taken the initial step of obtaining an indictment-and, indeed, has not taken any formal legal action apart from obtaining the Seizure Warrant based on inaccurate and false information - the government's obligation to return the property is all the more clear. On this basis alone, the Motion for Return of Property should be granted.

**B. Return of the Funds Is Also Required by Due Process.**

The government's delay in this case does not merely run afoul of CAPRA, but also violates the right to due process of law under the Fifth Amendment. After so much time has elapsed, any judicial forfeiture action would be so untimely that it would violate the due process standard established by the Supreme Court's decision in *United States v.*

*Eight Thousand Eight Hundred and Fifty Dollars ($8,850) in US. Currency*, 461 U.S. 555 (1983). See also *Fuentes v. Shevin*, 407 U.S . 67, 80 (1972) (due process entitles a property owner to a hearing "at a meaningful time"). Because due process acts as a total bar to any eventual forfeiture of the funds, there is no conceivable point to the government's continued possession of the funds and they must be immediately returned.

The Supreme Court explained, in *Eight Thousand Eight Hundred and Fifty Dollars*, that the test for whether delay in initiating forfeiture proceedings violates due process is the same as the test for whether a delayed trial violates a defendant's right to a speedy trial. See 461 U.S. at 564 (citing Barker v. Wingo, 407 U.S. 514 (1972)). In other words, the court looks to "four factors: length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." Id. The Court explained that "none of these factors is a necessary or sufficient condition for finding unreasonable delay," and that "these elements are guides in balancing the interests of the claimant and the Government to assess whether the basic due process requirement of fairness has been satisfied." *Id*. at 565. Of all the factors, "the overarching factor is the length of the delay." *Id*. Where a court finds that delay in initiating forfeiture proceedings amounts to a violation of due process, the proper remedy is to bar any forfeiture of the property and order its immediate return. See, e.g., *United States v. $23,407.69 in U.S. Currency,* 715 F.2d 162, 166 (5th Cir. 1983) (13-month delay); *United States v. $19,440.00 in U.S. Currency,* 829 F. Supp. 303, 305, 308 (D. Alaska 1993) (33-month delay); *United States v. Sharp*, 655 F. Supp. 1348, 1352 (W.O. Mo. 1987) (23-month delay). In other words, just as the remedy for a speedy trial violation is to bar the defendant's trial, the remedy for unreasonable delay in the forfeiture context is to bar

further forfeiture proceedings. The government is not entitled to hold property for years while searching for some retroactive justification to uphold a property seizure.

The second factor-the lack of any apparent explanation for the delay-also weighs heavily in favor of Bauché and BoundlessRise. Any investigation by the government has been halfhearted at best, consisting only of an affidavit submitted by FBI Agent Murray to a magistrate judge that asserts only hearsay information received from former FBI agents turned private investigators Bonin and Norell.

The third factor in the test-the steps taken to secure return of the property-likewise weighs in favor of Bauché and BoundlessRise. Bauché has worked diligently to secure the return of the property, including retaining counsel, serving a claim for the property to FBI Agent Murray, and promptly contacting the government in an effort to resolve the case.

Finally, the prejudice to Bauché and BoundlessRise from the deprivation of the property is manifest and significant. As the Supreme Court recognized in *Eight Thousand Eight Hundred and Fifty Dollars*, "[b]eing deprived of [a] substantial sum of money for a year and a half is undoubtedly a significant burden." 461 U.S. at 565; see also *$23,407.69 in US. Currency*, 715 F.2d at 166 (same). Indeed, "prejudice to the [property owner] can be presumed where he is deprived of the use of his property by the government without justifiable cause." *Sharp*, 655 F. Supp. at 1352. Bauché and BoundlessRise has been deprived of over $600,000 in operating funds and unable to pay its tax obligations from 2014-2016.

Indeed, even beyond such specific examples of prejudice, the Supreme Court has recognized that "excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify." *Doggett v. United States*, 505 U.S. 647, 655 (1992). The government must offer some justification-apart from a

desire to exert pressure to obtain a voluntary forfeiture-for imposing that burden on Mr. Bauché. Because it cannot do so, any forfeiture proceeding would be barred by due process and the property must be immediately returned.

## CONCLUSION

Both the provisions of CAFRA and the Due Process Clause of the Fifth Amendment to the U.S. Constitution require the immediate return of the seized funds from Wells Fargo Bank account number ******9784 from BoundlessRise, LLC. The accompanying motion for return of property should, therefore, be granted.

DATED: May 1, 2017

/s/    *Karren Kenney*
KARREN KENNEY
Attorney for Plaintiff/Movant

18

### DECLARATION OF KARREN KENNEY

I, Karren Kenney, declare as follows:

1.     I am counsel of record for Plaintiff/Movant John Bauché (hereinafter "claimant") in the above-entitled matter. Bauché is the sole principal for BoundlessRise, LLC.

2.     This declaration is made in support of claimant's motion for return for return of property (hereinafter "motion") filed concurrently herewith.

3.     I incorporate by reference as if fully set forth herein all factual averments contained in the motion. The facts are based upon my review of the seizure warrant and affidavit, a review of relevant business records concerning BoundlessRise, LLC, and emails sent and received either to or from FBI Agent Jessie Murray.

4.     Attached hereto as Exhibit 1 and incorporated herein by reference is a collection of letters submitted to Judge Guilford for Peter Norell's criminal case number SACR10-0046, which include reference letters signed by Murray, Howard, and AUSA Staples.

5.     Attached hereto as Exhibit 2 and incorporated herein by reference is the Seizure Warrant Affidavit submitted by Jessie Murray which contains misrepresentations and false information the magistrate was provided and relied on in issuing the seizure order.

6.     Attached as Exhibit 3 and incorporated herein by reference is a sample of the masimo.com SpHb Search Engine Optimization (SEO) Keyword reports for work completed by BoundlessRise for the SpHb technology product group, one of many groups that global SEO work was completed by BoundlessRise.

7.     Attached as Exhibit 4 is a true and correct copy of the Masimo Employment Offer Letter to Mr. Bauché dated March 15, 2013, which states his position was a Social Media Strategist Online Community Specialist Job Description and a true and correct copy of the Masimo Organization Chart as of July, 2014.

19

8.      Attached as Exhibit 5 and incorporated herein by reference is a chart showing how many levels of Masimo Management were required to sign-off on one simple invoice.

9.      Attached as Exhibit 6 and incorporated herein by reference is a copy of some of the credit card transactions for outsourcing through Paypal and American Express showing payment to BoundlessRise vendors, contractors, and other outsource websites for work completed.

10.     Attached as Exhibit 7 is a true and correct copy of the efiling in case number SACR 10-00046, specifically the Declarations of Agent Quigley and Takefman (without referenced attachments).

11.     Attached as Exhibit 8 is a true and correct copy of the 1031 exchange paperwork concerning the Lake Forest investment property .

        I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 1st day of May, 2017 in Costa Mesa, California.

/s/
KARREN KENNEY
Attorney for John Bauché

**PROOF OF SERVICE**

I, the undersigned, declare that I am a resident or employed in Orange County, California; that my business address is 575 Anton Blvd., Suite 300, Costa Mesa, California 92626; that I am over the age of 18 years; that I am not a party to the above entitled action; that I am a member of the Bar of the United States District Court for the Central District of California, and at whose direction I served the MOTION FOR RETURN OF PROPERTY

On May 1, 2017. following ordinary business practice, service was:

[] Placed in a closed envelope, for collection and hand-delivery

[ ] By hand-delivery addressed as follows:

[x] Placed in a sealed envelope for collection and mailing via United States Mail, addressed as follows:

**United States Attorney's Office**
**312 North Spring Street**
**Los Angeles, California 90012**

[] By facsimile as follows:

[ ] By e-mail as follows:

This proof of service is executed at Costa Mesa, California, on May 1, 2017.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

/s/KARREN KENNEY

# EXHIBIT 1

The Honorable Andrew Guilford
United States District Judge
Central District of California
411 W. Fourth Street
10th Floor
Santa Ana, CA  92701

April 15, 2010

RE:   PETER H. NORELL, JR.

Dear Judge Guilford:

We write in support of Pete Norell.  Although we are all Special Agents with the
FBI, we provide this letter of support in our personal capacities.

Pete did great work in his 14 years with the FBI.  His primary responsibilities
were investigating crimes involving fraud, and assisting victims of those crimes in
being made whole.  Because of his outstanding work, Pete received awards and
promotions.  Pete worked tirelessly.

Pete is a great role model.  He acted with integrity, and performed his job at the
highest level.  In short, he was a leader.  He will be sorely missed.

We know that Pete has pleaded guilty to a misdemeanor.  Despite this, we say,
without hesitation, that Pete is someone who we trust, and are proud to consider
him a colleague and friend.

We know that you have great discretion in considering a sentence for Pete.
When considering the punishment to impose, we respectfully request that you
consider Pete's many positive contributions to the FBI and law enforcement, and
how much he has already been punished as a result of losing the job he loved.

Respectfully submitted,

_Paul Bonin_ - PAUL BONIN

_Thomas Reitz_ - Thomas REITZ

_Douglas Thompson_ - Douglas Thompson

_Heather Watson Luke_ - Heather Watson Luke

M Catherine Uhey - CATHERINE VICAY

Monica J Fundis - Monica J Fundis

- TRUNG DANG

- Jim Danvin

_Lyselle Turlett_ - LYSELLE TURLETT

_Jessie T. Murray_ - Jessie T. Murray

- Elizabeth V Sims

_Elizabeth Gonzalez_ - Elizabeth Gonzalez

_Teresa Cooper_ - Teresa Cooper

ANTHONY GARCIA

Exhibit F, Page 2

B. CRAIG MASON

Stephen Busch

DAVID KINKAID

Jennifer Ruidy

ANISIMSIA McDORMAT

STEVEN T. BLOMAN

JON HABBEN

TIM Jacoby

Patrick Baldree

TRENTA LLILEY

STEPHEN SHAW

John Spratlin

Mark Winchester

Glenn K. Hoterma

MATT PARKER

RANDALL DEVINE

Dale Monroe

MATT ROGERS

JOHN D. WILSON

MARK S. TROTT

SCOTT P. HILL

Nicholas Vicovs

GHEORGHE TALO

Gary Bennett

JoE Rock

Kathleen L Carsen

Cynthia Kayle

Scott Haley

BOBBY ADIB

Edward J Joo

Jennifer Downer

AD Power Anderson

Demetrio Avelineda

Brad A. Howard



April 12, 2010

To: U.S. District Judge Andrew J. Guilford

RE: Peter H. Norell

I am a Special Agent with the Federal Bureau of Investigation. Before my employment with the Bureau, I was a civil attorney in Santa Ana for 9 years. I have been with the Bureau for about 13 years now and during the past 5 years I have worked for, and alongside, Pete Norell. This letter represents my personal opinion of Pete and does not necessarily reflect the opinion of the FBI.

I met Pete about 5 years ago when he was hired to be the supervisor of our white collar crime squad. From the outset, it was clear to me that Pete was a superbly qualified person to run the squad. He had a thorough understanding of the violations we investigated. And, while some supervisors are sometimes hesitant or reluctant to go the extra mile to assist their squads, that was not the case with Pete. He was always there for us whether we needed help out in the field, assistance from other parts of the Bureau, or in just spending whatever time was necessary to discuss the complexities and investigative options of our individual cases.

Pete has a way about him that I and others appreciate. He is honest, fair and thorough. He is consistently friendly and nice to everybody. He also has an energy about him that was unique to our office since he was always there to help anybody, anytime, anywhere. Most importantly, his integrity is second to none, and he uses good common sense and judgment.

After Pete concluded his job as our supervisor, he became one of us - a Special Agent on our squad. For about the past year or so, Pete sat right next to me in our cubicle area, so I was able to get to know him even better. As an agent, no question, he clearly was one of the elite. As a person, he is exactly the same. He regularly demonstrated his love for his family since he was always sharing stories about his wife and three young sons. It is obvious that Pete is a great husband and father. Pete is a 100% consistent and trustworthy guy, day in, day out.

I have never doubted Pete's character or integrity and I believe he is the type of person who always strives to do the right thing in both his personal and professional life.

Sincerely,

Brad A. Howard

# GREGORY W. STAPLES

April 22, 2010

The Honorable Andrew J. Guilford
United States District Judge
411 West Fourth Street
10th floor
Santa Ana, California 92701

        Re: Pete Norell

Dear Judge Guilford:

        Although I am an Assistant U.S. Attorney, I write this
letter in my personal capacity.  I have worked with Pete Norell
for more than ten years.  I say without hesitation that Pete is
the finest Special Agent I have worked with.  Pete has always
demonstrated the highest commitment to bringing white collar
defendants to justice.  As one who has had the privilege of
working with Pete, I feel a tremendous personal loss at his
forced departure from the FBI.  The true victims in this case are
the victims of fraud in this country, who, in my experience and
opinion, have now lost the most effective agent to ever work on
their behalf.  Although my relationship with Pete is grounded
mostly in our working relation as case agent and prosecutor, in
investigating and prosecuting criminal cases, you cannot help but
come to know the person behind the title.  I know Pete to be a
man of highest integrity.  I would not flinch at entrusting the
lives of me or my family to Pete.

        The only thing more important to Pete than doing his job
right was his wife and three children.  I recall more than one
weekend working in the office with Pete (who, as a Special Agent,
was not paid overtime for working weekends) when he would leave
to attend one of his kid's sporting events, only to return to
work later that day.  Pete had two loves in his life, his family
and his work with the FBI.  Now one of those is gone.

        I cannot overstate the sense of loss and anger felt by my
colleagues and me over what has happened to Pete.  I have never
known Pete to use his position as a Special Agent to benefit
anyone other than the victims of fraud.  I believe that is what
motivated him in the present case.

        I urge you to impose neither imprisonment, probation, home
confinement, a fine, nor any other penalty or restriction on Pete
at sentencing.  I find even the idea of putting a man of Pete's

Case 8:17-cv-00771-CJC-JCG  Document 1  Filed 05/01/17  Page 27 of 75  Page ID #:27
Case 8:10-cr-00046-AG  Document 16-1  Filed 05/27/10  Page 18 of 88  Page ID #:68
APR-22-2010  13:15          1 714 338 3564                                      P.003

integrity on probation offensive and a waste of court resources.
There is nothing anyone can do now to Pete that will cause more
(pointless) harm to Pete, his family, the FBI, and the country
than ending his truly stellar career as a Special Agent with the
FBI.

Finally, as the Court may discern, I have very strong
feelings about Pete.  To that end, I would ask leave to address
the Court on Pete's behalf at sentencing.  Thank you for
considering my letter.

Respectfully yours,

Gregory W. Staples

# EXHIBIT 2

ORIGINAL

# United States District Court

**CENTRAL**      **DISTRICT OF**      **CALIFORNIA**

**In the Matter of the Seizure of**
(Address or Brief description of property or premises to be seized)

All funds on deposit in Wells Fargo Bank account number
6331349784.

**SEIZURE WARRANT**

**CASE NUMBER:**
**SA 16-542M**

TO: <u>FEDERAL BUREAU OF INVESTIGATION</u> and any Authorized Officer of the United States, Affidavit(s) having been made before me by <u>SPECIAL AGENT JESSIE T. MURRAY</u> who has reason to believe that in the Central District of California there is now certain property which is subject to forfeiture to the United States, namely (describe the property to be seized)

All funds on deposit in Wells Fargo Bank account number▮▮▮▮▮▮▮▮0784.

**which is** (state one or more bases for seizure under United States Code)

subject to seizure and forfeiture under 18 U.S.C. §§ 981(a)(1)(B)(C) and 981(b).

**concerning a violations of Title <u>18</u> United States Code, Section(s) <u>1341, 1343 and 1956</u>.**

I am satisfied that the affidavit(s) and any recorded testimony establish probable cause to believe that the property so described is subject to seizure and that grounds exist for the issuance of this seizure warrant.

<u>Wells Fargo Bank</u> is ordered to deliver said funds immediately and forthwith upon presentation of this warrant to the law enforcement agent serving the warrant, in the form of a cashier's check made payable to the United States Treasury.

YOU ARE HEREBY COMMANDED to seize within 14 days the property specified, serving this warrant and making the seizure in the daytime - 6:00 A.M. to 10:00 P.M., leaving a copy of this warrant and receipt for the property seized, and prepare a written inventory of the property seized and promptly return this warrant to the undersigned judicial officer as required by law. The recipient of this Warrant is HEREBY COMMANDED to comply with the duties and obligations set out in Attachment A attached hereto.

11-28-16 @ 2:19 p.m
_____
Date and Time Issued

_____
**Hon. Jay C. Gandhi, U.S. Magistrate Judge**
Name and Title of Judicial Officer

_____Santa Ana, California_____
City and State

_____
Signature of Judicial Officer

**AUSA Frank Kortum**  FDK



# United States District Court

_____CENTRAL_____ **DISTRICT OF** _____CALIFORNIA_____

**In the Matter of the Seizure of**
(Address or Brief description of property or premises to be seized)

All funds on deposit in Wells Fargo Bank account number
6331349784.

**APPLICATION AND AFFIDAVIT
FOR SEIZURE WARRANT**

**CASE NUMBER:**

**SA16-542M**

I, <u>JESSIE T. MURRAY</u>, being duly sworn depose and say:

I am a Special Agent with the Federal Bureau of Investigation, and have reason to believe that
in the _____CENTRAL_____ District of _____CALIFORNIA_____
there is now concealed a certain person or property, namely (describe the person or property to be seized)

All funds on deposit in Wells Fargo Bank account number 6331349784.

which is (state one or more bases for seizure under United States Code)

subject to seizure and forfeiture under 18 U.S.C. §§ 981(a)(1)(B)(C) and 981(b).

concerning a violations of Title <u>18</u> United States Code, Section(s) <u>1341, 1343 and 1956.</u>

The facts to support a finding of Probable Cause for issuance of a Seizure Warrant are as follows:

Continued on the attached sheet and made a part hereof.     X Yes __ No

FILED
CLERK, U.S. DISTRICT COURT

NOV 2 8 2016

CENTRAL DISTRICT OF CALIFORNIA
BY_____ DEPUTY

/s/
**Signature of Affiant**

Sworn to before me, and subscribed in my presence

_11·28·2016_
Date

_Santa Ana, California_
**City and State**

Jay C. Gandhi

_Hon. Jay C. Gandhi, U.S. Magistrate Judge_
**Title of Judicial Officer**

**Signature of Judicial Officer**

AUSA Frank Kortum   FOK

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEIZURE WARRANT

1.    I, Jessie T. Murray, being duly sworn, hereby say the following is true based upon my personal knowledge and belief:

### I.

### INTRODUCTION

2.    I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") and have been so employed since 1995.  Presently I am assigned full time to investigation in forfeiture related matters.

3.    Unless stated otherwise, I have personal knowledge of the matters set out in this affidavit.  To the extent that any information in this affidavit is not within my personal knowledge, it was made known to me by case agent SA Brad Howard ("SA Howard") of the FBI, or as a result of my review of official FBI records.  This affidavit is offered for the sole purpose of establishing probable cause to seize the asset described below and does not set forth all of the facts of this investigation.  Unless  specifically  indicated  otherwise,  all conversations and statements described in this affidavit are related in substance and in part only.

### II.

### PURPOSE OF AFFIDAVIT

4.    This affidavit is offered in support of an application for a seizure warrant for all funds on deposit in Wells Fargo Bank Account Number ▊▊▊▊▊ ("Account No. '9784"), in the name of BoundlessRise LLC ("SUBJECT FUNDS").

1

5.    The SUBJECT FUNDS are subject to seizure and forfeiture to the United States because there is probable cause to believe that the SUBJECT FUNDS represent or are traceable to proceeds of one of more violations of 18 U.S.C. §1341 (Mail Fraud) and/or 18 U.S.C. §1343 (Wire Fraud) (both of which are specified unlawful activities as defined in 18 U.S.C. Section 1956(c)(7)(A) and 1961(1)), and 18 U.S.C. §1956 (Money Laundering).  As such, the SUBJECT FUNDS are subject to seizure pursuant to 18 U.S.C. §981(b) and forfeiture pursuant to 18 U.S.C. §981(a)(1)(A) and §981(a)(1)(C).

### III.

### SUMMARY OF FACTS ESTABLISHING
### PROBABLE CAUSE FOR FORFEITURE

6.    As discussed more fully below, the FBI is investigating a fraud scheme operated by JOHN JOSEPH BAUCHE ("BAUCHE") through his company, BoundlessRise LLC, operating out of Newport Beach, California.  BAUCHE is a resident of Mission Viejo, California.  BAUCHE created a shell company and promoted it as the best outside marketing vendor to and for his employer, when in fact the outside marketing vendor was BAUCHE's own company.  BAUCHE created false invoices and submitted them for payment to his employer.  The investigation revealed that BAUCHE engaged in mail fraud, wire fraud, and money laundering in the Central District of California in connection with the fraud scheme he operated.

7.    BAUCHE was hired as a marketing employee in March 2013 by Masimo, a company based in Irvine, CA.  Masimo is a medical technology company that develops and manufactures medical devices and sensors.

2

8.    In 2014, Masimo hired an outside marketing vendor,
BOUNDLESS RISE, for search engine and website optimization.  BAUCHE
falsely represented to Masimo that BOUNDLESS RISE was the best search
engine optimization vendor for Masimo.  BAUCHE falsely represented to
Masimo that BOUNDLESS RISE had been through the normal Masimo vendor
selection process with three other potential vendors for search engine
marketing.  BAUCHE further falsely represented that BOUNDLESS RISE was
chosen by BAUCHE because its cost was two-thirds of the other vendors,
they billed quarterly, there was no long term commitment or contract,
and they would provide dedicated support and work with Masimo website
developers for on-page optimization.  BAUCHE failed to tell Masimo
that BOUNDLESS RISE was BAUCHE's own company, a fact that would have
been material to Masimo.  Had Masimo known that BOUNDLESS RISE was
BAUCHE's company, it would not have entered into any business dealings
with BOUNDLESS RISE.

9.    In July 2016, a Masimo employee discovered that BAUCHE was
the domain registrant for BOUNDLESS RISE.  Further investigation by
Masimo revealed that BOUNDLESS RISE was incorporated in February 2014
in Wyoming by BAUCHE, using the same phone number and e-mail address
listed in his employment application with Masimo.  Additionally, the
BOUNDLESS RISE LLC Annual Report, dated March 11, 2015, was found to
have been signed by BAUCHE.

10.    Masimo began receiving invoices from BOUNDLESS RISE on
March 24, 2014.  The invoices were paid by check, and Masimo mailed
the checks to BOUNDLESS RISE's office, located at 220 Newport Center
Drive, Suite 11-211, Newport Beach, CA.  A total of $761,675 in checks

3

from Masimo, made payable to BOUNDLESS RISE, were deposited into
Account No. '9784 on or about the following dates:

> 04/06/14 - $ 15,800
>
> 05/15/14 - $ 27,200
>
> 11/05/14 - $ 90,000
>
> 02/13/15 - $104,300
>
> 04/29/15 - $ 92,950
>
> 06/05/15 - $ 20,625
>
> 07/09/15 - $ 18,000
>
> 07/30/15 - $169,650
>
> 11/06/15 - $223,150

11.   On July 20, 2016, BAUCHE was interviewed by Investigators
Pete Norell and Paul Bonin, from Norell Consulting, Inc. ("Norell").
During the interview, BAUCHE admitted that he incorporated a shell
company, BOUNDLESS RISE, created false invoices under the name of
BOUNDLESS RISE, and submitted the invoices for payment to Masimo.
BAUCHE claimed that he employed Virtual Group, a company in the
Philippines, to do all of the search engine optimization work.  BAUCHE
provided the Norell investigators with an invoice dated June 30, 2016
for $15,781 from Virtual Group.  BAUCHE admitted that BOUNDLESS RISE
did none of the work.  BAUCHE, through BOUNDLESS RISE, marked up the
Masimo invoices 25%, keeping the markup and paying Virtual Group the
amount owed.  BAUCHE said he used some of the funds to buy an
investment property in Lake Forest, CA.

12.   BAUCHE further admitted to the Norell investigators that he
believed there was $30,000 to $40,000 still left in Account No. '9784

4

16.   Aside from the single referenced Virtual Group invoice, there was no additional marketing work done by an outside marketing vendor for Masimo.   Any marketing work done by BAUCHE was performed as part of his duties as a marketing employee for Masimo.

### FINANCIAL ANALYSIS

17.   On July 20, 2016, BAUCHE made a withdrawal from Account No. '9784 (the account containing the SUBJECT FUNDS) in the amount of $27,000 (which was used to fund the cashier's check to Masimo).   On the same day, BAUCHE transferred $710,000 to Wells Fargo Bank Account No. '9058 (Account No. '9058 Account), in the name of Skyward Investments LLC (another company owned by BAUCHE).   The transferred funds represented payments to BAUCHE by Masimo, which was the sole funding source for Account No. '9784.

18.   On July 26, 2016, BAUCHE transferred $707,000 from Account No. '9058 to Account No. '9784.

19.   On November 23, 2016, the current balance in Account No. '9784 (the account containing the SUBJECT FUNDS) was $642,643.71. BAUCHE's transfer of funds between the two accounts was an attempt to conceal and disguise the nature, location, and source of the SUBJECT FUNDS, which represent proceeds of the mail fraud and wire fraud.

///

///

6

## VIII.

### CONCLUSION

20.   The evidence set out above establishes probable cause to believe that the SUBJECT FUNDS are subject to seizure pursuant to 18 U.S.C. §981(b), and forfeiture pursuant to 18 U.S.C. §981(a)(1)(A) and §981(a)(1)(C), on the grounds that the SUBJECT FUNDS represent or are traceable to proceeds of one or more violations of 18 U.S.C. §1341 (Mail Fraud), 18 U.S.C. §1343 (Wire Fraud), and were involved in one or more transactions in violation of 18 U.S.C. §1956 (Money Laundering).

/s/
_____

Jessie T. Murray
Special Agent
Federal Bureau of Investigation

Sworn and subscribed to before me
this __24__ day of November, 2016.

## Jay C. Gandhi

_____
UNITED STATES MAGISTRATE JUDGE

7

# EXHIBIT 3

## Masimo.com (sphb)

| Keyword Classification | Keywords |
|---|---|
| | |
| Over the Top | hemoglobin monitor |
| Over the Top | hemoglobin monitoring |
| Over the Top | total hemoglobin |
| Over the Top | hemoglobin |
| Over the Top | hemoglobin testing |
| Advanced | non invasive monitoring |
| Advanced | low hemoglobin blood test |
| Advanced | non invasive hemoglobin |
| Over the Top | sphb hemoglobin |
| Advanced | masimo hemoglobin monitoring |
| Advanced | non invasive hemoglobin testing |
| Over the Top | trali |
| Over the Top | hemodilution |
| Over the Top | blood monitoring |
| Over the Top | blood management |
| Over the Top | bleeding disorder |
| Over the Top | bleeding disorders |
| Over the Top | blood transfusion |
| Over the Top | bleeding hemorrhoids |
| Over the Top | hemorrhoidal bleeding |
| Over the Top | blood loss |
| Advanced | bleeding stomach ulcers |
| Advanced | blood test for hemoglobin |
| Advanced | blood tests hemoglobin |
| Advanced | patient blood management program |
| Advanced | normal hemoglobin levels |
| Advanced | blood management program |
| Advanced | hemoglobin blood test |
| Advanced | hemoglobin blood count |
| Advanced | strategic blood management |
| Advanced | treatment for anemia |
| Advanced | blood management companies |
| Advanced | treatments for anemia |
| Advanced | hemoglobin levels for anemia |
| Advanced | anemia blood transfusion |
| Advanced | anemia and hemoglobin levels |
| Advanced | occult blood loss |
| Advanced | blood transfusion and anemia |
| Advanced | goal directed therapy |
| Basic | blood bank and transfusion services |
| Basic | blood transfusion to treat anemia |
| Basic | iron deficiency anemia blood transfusion |

| Basic | blood transfusion due to anemia |
|-------|--------------------------------|
| Basic | low hemoglobin treatment blood transfusion |
| Basic | blood transfusion for anemia treatment |

| Google Ave. Ranking Results | |
|---|---|
| 27-Jun-14 | 14-Oct-14 |
| 150+ | 1 |
| 150+ | 1 |
| 150+ | 1 |
| 150+ | 22 |
| 150+ | 25 |
| 150+ | 32 |
| 150+ | 45 |
| 150+ | 1 to 2 |
| 150+ | 1 to 3 |
| 150+ | 1 to 3 |
| 150+ | 2 to 3 |
| 150+ | 100+ |
| 150+ | 100+ |
| 150+ | 100+ |
| 150+ | 100+ |
| 150+ | 100+ |
| 150+ | 100+ |
| 150+ | 100+ |
| 150+ | 100+ |
| 150+ | 100+ |
| 150+ | 100+ |
| 150+ | 100+ |
| 150+ | 100+ |
| 150+ | 100+ |
| 150+ | 100+ |
| 150+ | 100+ |
| 150+ | 100+ |
| 150+ | 100+ |
| 150+ | 100+ |
| 150+ | 100+ |
| 150+ | 100+ |
| 150+ | 100+ |
| 150+ | 100+ |
| 150+ | 100+ |
| 150+ | 100+ |
| 150+ | 100+ |
| 150+ | 100+ |
| 150+ | 100+ |
| 150+ | 100+ |
| 150+ | 100+ |
| 150+ | 100+ |
| 150+ | 100+ |

| 150+ | 100+ |
|------|------|
| 150+ | 100+ |
| 150+ | 100+ |

# EXHIBIT 4



MASIMO CORPORATION
Forty Parker
Irvine, CA 92618

March 15, 2013

John Bauche

██████████

Dear John:

It is with great pleasure that we extend this formal offer to you to join Masimo as a Social Media Strategist reporting to Mark Scott, Vice President, Marketing Communications. You will be assigned to our Irvine office located at 40 Parker, Irvine, CA 92618. If you accept this offer, we would like you to begin on April 1, 2013.

The purpose of this letter is to offer you employment with Masimo on the terms and conditions set forth below:

Annual Salary:      ████████████████████████████████████████
                    ████████

Bonus Potential:    You will be eligible to participate in Masimo's Bonus Plan for up to 10% of your salary based on Company and individual objectives being met.

Benefits:           You will be eligible for health/dental and other insurance coverage, participation in the Company's 401(k) plan, and paid vacation, holiday and sick leave. In 2013, the company has determined a mandatory department shutdown period of 5 days in August or 5 days in December. The days off are based on functional areas and requirements, and you will be required to use your vacation time. Insurance coverage will begin the first day of the first month after your employment begins.

You will be eligible to receive options under Masimo's Stock Option Plan as determined by the Board of Directors. If you accept this employment offer, it will be recommended that the Board issue you an option to purchase 750 shares of Common Stock, vesting 20% per year over five years and exercisable at fair market value at the time the option is granted.

This offer is contingent upon you (1) signing and returning the Masimo Employee Confidentiality Agreement and Mutual Agreement to Arbitrate Claims, (2) successfully passing the Company's background check, reference check and drug screening processes, (3) confirming in writing that you are not under any contractual or legal restrictions with a previous employer that may impair your ability to perform your duties for Masimo, and (4) providing proof of identity and legal authorization to work in the United States. You are encouraged to discuss any of the attached documents with your own advisor to the extent you desire.

John Bauche
March 15, 2013
Page 2 of 2

Employment with Masimo is not for a specific term and is "at-will", meaning that either you or the Company may terminate the employment relationship at any time, with or without notice and with or without any reason.

This letter sets forth all the material terms of our offer of employment, and it supersedes all prior offers, agreements and discussions about employment that you may have had with any employee of the Company, whether written or oral. The terms of this employment offer cannot be modified or amended by any supervisor or by any action of Masimo. Any modification or amendment must be in writing signed by both you and an officer of the Company.

Please confirm your acceptance of this offer and agreement to the terms of this letter by signing below and returning the signed original to me. If we have not received your signed acceptance by March 22, 2013 this offer will be withdrawn.

If you have any questions about our employment offer, please feel free to contact me.

We look forward to you joining our Team

Sincerely,

Tracy Miller
People Operations Manager

Accepted and agreed:

_____     _____3/23/13_____
John Bauche                 Date

# EXHIBIT 5

# Organizational Chart
## EVP Marketing
## Direct Reports

Headcount
| | |
|---|---|
| EVP | (1/1) |
| International Marketing | (8/9) |
| Clinical Advocacy | (1/1) |
| Corporate Communications | (3/4) |
| Marketing Communications | (15/18) |
| Marketing | (13/19) |
| Technical Product Mgmnt | (4/5) |
| Total | 45/56 |



# EXHIBIT 6



Merchant Account ID: ██████████          PayPal ID: johnbauch██████████          2/23/2014 - 12/31/2014

## Transaction History - USD

| Date | Description | Name \ Email | Gross | Fee | Net |
|------|-------------|--------------|-------|-----|-----|
| 3/5/2014 | General Credit Card Deposit<br>ID: 9WP13726B30716518 | | 175.00 | 0.00 | 175.00 |
| 3/5/2014 | General Payment<br>ID: 0UR22876HL176445E | Rodrigo, Jr Po | -175.00 | 0.00 | -175.00 |
| 3/18/2014 | General Credit Card Deposit<br>ID: 1PR22344C8778240A | | 175.00 | 0.00 | 175.00 |
| 3/18/2014 | General Payment<br>ID: 6LT194079N819374N | Rodrigo, Jr Po | -175.00 | 0.00 | -175.00 |
| 3/22/2014 | Mobile Payment<br>ID: 0DE65273MJ8973628 | Dan Fredinburg | 500.00 | 0.00 | 500.00 |
| 3/22/2014 | General Payment<br>ID: 5N274317X8345742E | Dan Fredinburg | -500.00 | 0.00 | -500.00 |
| 3/22/2014 | Mobile Payment<br>ID: 3PT22218C9773760M | Dan Fredinburg | 500.00 | 0.00 | 500.00 |
| 3/22/2014 | Account Hold for Open Authorization<br>ID: 9V145468UL499324A | | -304.00 | 0.00 | -304.00 |
| 3/22/2014 | Reversal of General Account Hold<br>ID: 9RW53170L93403710 | | 304.00 | 0.00 | 304.00 |
| 3/22/2014 | PayPal Debit Card Withdrawal to ATM<br>ID: 7A117710Y08771338 | | -303.00 | -1.00 | -304.00 |
| 3/23/2014 | Account Hold for Open Authorization<br>ID: 2LC155013B7029812 | | -184.00 | 0.00 | -184.00 |
| 3/23/2014 | Reversal of General Account Hold<br>ID: 3JU048655E187264S | | 184.00 | 0.00 | 184.00 |
| 3/23/2014 | PayPal Debit Card Withdrawal to ATM<br>ID: 22W64524LK8677153 | | -183.00 | -1.00 | -184.00 |
| 3/23/2014 | General Withdrawal - Bank Account<br>ID: 1BU243181D2545921 | | -12.00 | 0.00 | -12.00 |
| 3/24/2014 | General Credit Card Deposit<br>ID: 2NK152883S887510S | | 175.00 | 0.00 | 175.00 |
| 3/24/2014 | General Payment<br>ID: 17U58471U8405172E | Rodrigo, Jr Po | -175.00 | 0.00 | -175.00 |
| 4/21/2014 | General Credit Card Deposit<br>ID: 2V152203FL8941936 | | 175.00 | 0.00 | 175.00 |
| 4/21/2014 | General Payment<br>ID: 0EN74548F6765930V | Rodrigo, Jr Po | -175.00 | 0.00 | -175.00 |
| 5/5/2014 | General Credit Card Deposit<br>ID: 1PK25639KH239101U | | 175.00 | 0.00 | 175.00 |



Merchant Account ID: ⬛⬛⬛⬛⬛          PayPal ID: johnbauche⬛⬛⬛⬛          2/23/2014 - 12/31/2014

## Transaction History - USD

| Date | Description | Name \ Email | Gross | Fee | Net |
|------|-------------|--------------|-------|-----|-----|
| 5/5/2014 | General Payment<br>ID: 5J122210KR195945X | Rodrigo, Jr Po | -175.00 | 0.00 | -175.00 |
| 5/18/2014 | General Credit Card Deposit<br>ID: 6CV602520W280762A | | 175.00 | 0.00 | 175.00 |
| 5/18/2014 | General Payment<br>ID: 7DL05550SS063572H | Rodrigo, Jr Po | -175.00 | 0.00 | -175.00 |
| 5/24/2014 | General Credit Card Deposit<br>ID: 2L420830L6832134H | | 54.00 | 0.00 | 54.00 |
| 5/24/2014 | eBay Auction Payment<br>ID: 22S92895WB9505945 | | -54.00 | 0.00 | -54.00 |
| 5/25/2014 | General Credit Card Deposit<br>ID: 2WW02834KK2285508 | | 54.48 | 0.00 | 54.48 |
| 5/25/2014 | Express Checkout Payment<br>ID: 7BS1464421352420S | | -54.48 | 0.00 | -54.48 |
| 6/3/2014 | General Credit Card Deposit<br>ID: 2EL61277VJ745051M | | 175.00 | 0.00 | 175.00 |
| 6/3/2014 | General Payment<br>ID: 37942606729900931 | Rodrigo, Jr Po | -175.00 | 0.00 | -175.00 |
| 6/9/2014 | General Credit Card Deposit<br>ID: 73D87220XB013393U | | 197.00 | 0.00 | 197.00 |
| 6/9/2014 | Website Payment<br>ID: 70A09876PB175581V | | -197.00 | 0.00 | -197.00 |
| 6/17/2014 | General Credit Card Deposit<br>ID: 5E579623FF320230B | | 175.00 | 0.00 | 175.00 |
| 6/17/2014 | General Payment<br>ID: 99C748668F288931B | Rodrigo, Jr Po | -175.00 | 0.00 | -175.00 |
| 7/6/2014 | General Credit Card Deposit<br>ID: 817145471H078245X | | 175.00 | 0.00 | 175.00 |
| 7/6/2014 | Mobile Payment<br>ID: 94W5453017408113X | Rodrigo, Jr Po | -175.00 | 0.00 | -175.00 |
| 7/9/2014 | General Credit Card Deposit<br>ID: 6CW2508306351724Y | | 6,813.75 | 0.00 | 6,813.75 |
| 7/9/2014 | Website Payment<br>ID: 3R922741U2149413L | ENDLESSRISE INC<br>payments@endlessrise.com | -6,813.75 | 0.00 | -6,813.75 |
| 7/9/2014 | General Credit Card Deposit<br>ID: 1JF30840NA406605P | | 9,998.75 | 0.00 | 9,998.75 |
| 7/9/2014 | Website Payment<br>ID: 7YJ71062TY701220A | ENDLESSRISE INC<br>payments@endlessrise.com | -9,998.75 | 0.00 | -9,998.75 |



Merchant Account ID: ███████          PayPal ID: johnbauche@███████          2/23/2014 - 12/31/2014

## Transaction History - USD

| Date | Description | Name \ Email | Gross | Fee | Net |
|------|-------------|--------------|-------|-----|-----|
| 7/20/2014 | General Credit Card Deposit<br>ID: 5X3633740X8120126 | | 175.00 | 0.00 | 175.00 |
| 7/20/2014 | General Payment<br>ID: 0EX399947V622411R | Rodrigo, Jr Po<br>████████ | -175.00 | 0.00 | -175.00 |
| 7/27/2014 | General Credit Card Deposit<br>ID: 85A71749AG9980015 | | 103.95 | 0.00 | 103.95 |
| 7/27/2014 | Website Payment<br>ID: 6SS00474BX054035K | ████████ | -103.95 | 0.00 | -103.95 |
| 7/28/2014 | General Credit Card Deposit<br>ID: 4HK83539CV616624D | | 27.00 | 0.00 | 27.00 |
| 7/28/2014 | Website Payment<br>ID: 30175520AC1954713 | LeadsClick<br>████████ | -27.00 | 0.00 | -27.00 |
| 8/4/2014 | General Credit Card Deposit<br>ID: 39N773495K167163P | | 175.00 | 0.00 | 175.00 |
| 8/4/2014 | General Payment<br>ID: 1AK099815G992412H | Rodrigo, Jr Po<br>████████ | -175.00 | 0.00 | -175.00 |
| 8/12/2014 | General Credit Card Deposit<br>ID: 0A87935227934691C | | 99.00 | 0.00 | 99.00 |
| 8/12/2014 | Website Payment<br>ID: 3HA60372NV415113J | ████████ | -99.00 | 0.00 | -99.00 |
| 8/21/2014 | General Credit Card Deposit<br>ID: 9PV33740EM662314P | | 175.00 | 0.00 | 175.00 |
| 8/21/2014 | General Payment<br>ID: 2K098664G93453211 | Rodrigo, Jr Po<br>████████ | -175.00 | 0.00 | -175.00 |
| 9/3/2014 | General Credit Card Deposit<br>ID: 3AX55914W24988516 | | 175.00 | 0.00 | 175.00 |
| 9/3/2014 | General Payment<br>ID: 2LY06294M80140453 | Rodrigo, Jr Po<br>████████ | -175.00 | 0.00 | -175.00 |
| 9/6/2014 | General Credit Card Deposit<br>ID: 3F971637896592837 | | 70.00 | 0.00 | 70.00 |
| 9/6/2014 | Website Payment<br>ID: 2BM69015YJ939524L | ████████ | -70.00 | 0.00 | -70.00 |
| 9/21/2014 | General Credit Card Deposit<br>ID: 2W801159FM723181J | | 175.00 | 0.00 | 175.00 |
| 9/21/2014 | General Payment<br>ID: 1RK04620YR8556446 | Rodrigo, Jr Po<br>████████ | -175.00 | 0.00 | -175.00 |



Merchant Account ID: ▓▓▓▓▓▓▓      PayPal ID: johnbauche▓▓▓▓▓▓      2/23/2014 - 12/31/2014

## Transaction History - USD

| Date | Description | Name \ Email | Gross | Fee | Net |
|------|-------------|--------------|-------|-----|-----|
| 9/21/2014 | General Credit Card Deposit<br>ID: 6UY86229W3192443R | | 50.00 | 0.00 | 50.00 |
| 9/21/2014 | General Payment<br>ID: 69782943L1011730T | Kristine Trinidad | -50.00 | 0.00 | -50.00 |
| 9/29/2014 | General Payment<br>ID: 9CY81144PY4838911 | | 49.00 | -1.72 | 47.28 |
| 10/3/2014 | General Credit Card Deposit<br>ID: 9KN460006S4898634 | | 160.82 | 0.00 | 160.82 |
| 10/3/2014 | General Payment<br>ID: 3LJ79640X3126371A | Rodrigo, Jr Po | -200.00 | -8.10 | -208.10 |
| 10/17/2014 | General Credit Card Deposit<br>ID: 2Y290628H18850613 | | 208.10 | 0.00 | 208.10 |
| 10/17/2014 | General Payment<br>ID: 58C077934D9851248 | Rodrigo, Jr Po | -200.00 | -8.10 | -208.10 |
| 11/4/2014 | General Credit Card Deposit<br>ID: 8WS24080YP618850R | | 208.10 | 0.00 | 208.10 |
| 11/4/2014 | General Payment<br>ID: 23F90037284910644 | Rodrigo, Jr Po | -200.00 | -8.10 | -208.10 |
| 11/21/2014 | General Credit Card Deposit<br>ID: 85B30757WT704144F | | 208.10 | 0.00 | 208.10 |
| 11/21/2014 | General Payment<br>ID: 3VS090641R4468010 | Rodrigo, Jr Po | -200.00 | -8.10 | -208.10 |
| 12/5/2014 | General Credit Card Deposit<br>ID: 6GR8929447549115P | | 208.10 | 0.00 | 208.10 |
| 12/5/2014 | General Payment<br>ID: 2CM89177S2715451D | Rodrigo, Jr Po | -200.00 | -8.10 | -208.10 |
| 12/17/2014 | General Credit Card Deposit<br>ID: 85W24037E42113705 | | 197.00 | 0.00 | 197.00 |
| 12/17/2014 | Website Payment<br>ID: 0R563921W5654171G | | -197.00 | 0.00 | -197.00 |
| 12/19/2014 | General Credit Card Deposit<br>ID: 0P141594TR012163U | | 208.10 | 0.00 | 208.10 |
| 12/19/2014 | General Payment<br>ID: 70F981108U4761013 | Rodrigo, Jr Po | -200.00 | -8.10 | -208.10 |

To report an unauthorized transaction or other error NOT involving your debit card: call (402-938-3614) or write to us (Attn: Error Resolution Department, P.O. Box 45950, Omaha, NE 68145-0950).

To report an unauthorized transaction or other error concerning your debit card: call (402-938-3614), fax (303-395-2855) or write to us (PayPal Debit Card Department, P.O. Box 45950, Omaha, NE 68145-0950).

To cancel a pre-authorized or recurring payment or determine whether a pre-authorized or recurring transfer has been made: call us at 1-877-896-6383 (please note that only calls pertaining to pre-authorized or recurring payments will be accepted at this number).

 **PayPal**

| Merchant Account ID: ▓▓▓▓▓▓ | PayPal ID: johnbauch▓▓▓▓▓▓ | 1/1/2015 – 12/31/2015 |
| --- | --- | --- |

## Transaction History - USD

| Date | Description | Name \ Email | Gross | Fee | Net |
| --- | --- | --- | --- | --- | --- |
| 1/5/2015 | General Credit Card Deposit<br>ID: 71H27592213974731 | | 415.90 | 0.00 | 415.90 |
| 1/5/2015 | General Payment<br>ID: 2GF80848HY7848437 | Rodrigo, Jr Po | -400.00 | -15.90 | -415.90 |
| 1/19/2015 | General Credit Card Deposit<br>ID: 7MA98360YE7159136 | | 415.90 | 0.00 | 415.90 |
| 1/19/2015 | General Payment<br>ID: 5X526904WH9169019 | Rodrigo, Jr Po | -400.00 | -15.90 | -415.90 |
| 2/5/2015 | General Credit Card Deposit<br>ID: 02S73611099377422 | | 208.10 | 0.00 | 208.10 |
| 2/5/2015 | General Payment<br>ID: 3KR640756R645132H | Rodrigo, Jr Po | -200.00 | -8.10 | -208.10 |
| 2/23/2015 | Bank Deposit to PP Account<br>ID: 3XX882938G2132211 | | 201.00 | 0.00 | 201.00 |
| 2/23/2015 | General Payment<br>ID: 86T11814PL400840X | Rodrigo, Jr Po | -200.00 | -1.00 | -201.00 |
| 2/23/2015 | General Credit Card Deposit<br>ID: 2NH90403TT164504R | | 208.10 | 0.00 | 208.10 |
| 2/23/2015 | General Payment<br>ID: 1D144385XE099722J | Rodrigo, Jr Po | -200.00 | -8.10 | -208.10 |
| 2/26/2015 | Payment Refund<br>ID: 07T47749FB5655814 | Rodrigo, Jr Po | 200.00 | 1.00 | 201.00 |
| 3/3/2015 | General Withdrawal - Bank Account<br>ID: 0XP08802DM896654N | | -201.00 | 0.00 | -201.00 |
| 3/23/2015 | General Credit Card Deposit<br>ID: 04K50998TK0394613 | | 415.90 | 0.00 | 415.90 |
| 3/23/2015 | General Payment<br>ID: 9GT13119LT2997927 | Rodrigo, Jr Po | -400.00 | -15.90 | -415.90 |
| 6/16/2015 | General Credit Card Deposit<br>ID: 7PY18200HP412690A | | 197.71 | 0.00 | 197.71 |
| 6/16/2015 | General Payment<br>ID: 0SU24172GN585003N | Sole Proprietorshop | -190.00 | -7.71 | -197.71 |
| 6/16/2015 | General Credit Card Deposit<br>ID: 2PK13025NH534545A | | 104.20 | 0.00 | 104.20 |
| 6/16/2015 | General Payment<br>ID: 22R97500P0064470J | Michael George Guanzon | -100.00 | -4.20 | -104.20 |
| 7/2/2015 | General Credit Card Deposit<br>ID: 52W04018DX377781S | | 197.71 | 0.00 | 197.71 |



Merchant Account ID: ▮▮▮▮▮▮▮▮        PayPal ID: johnbauche@▮▮▮▮▮▮        1/1/2015 - 12/31/2015

## Transaction History - USD

| Date | Description | Name \ Email | Gross | Fee | Net |
|------|-------------|--------------|-------|-----|-----|
| 7/2/2015 | General Payment<br>ID: 0UJ58771FG414723C | Sole Proprietorshop | −190.00 | −7.71 | −197.71 |
| 7/16/2015 | General Credit Card Deposit<br>ID: 45A76728PL4785239 | | 197.71 | 0.00 | 197.71 |
| 7/16/2015 | General Payment<br>ID: 0L556796PR888102K | Sole Proprietorshop | −190.00 | −7.71 | −197.71 |
| 8/15/2015 | General Credit Card Deposit<br>ID: 2D001029WF4487359 | | 15.74 | 0.00 | 15.74 |
| 8/15/2015 | Mobile Payment<br>ID: 5LE54050E33965746 | Neil Malabuyoc | −15.00 | −0.74 | −15.74 |
| 9/24/2015 | General Credit Card Deposit<br>ID: 5US1002058188722M | | 300.00 | 0.00 | 300.00 |
| 9/24/2015 | General Payment<br>ID: 3FU73688NC819715A | Saul Farber | −300.00 | 0.00 | −300.00 |
| 10/4/2015 | General Payment<br>ID: 7NG35139Y2178425S | | 1,000.00 | 0.00 | 1,000.00 |
| 10/9/2015 | General Payment<br>ID: 4AR975358B4114440 | | 1,000.00 | 0.00 | 1,000.00 |
| 10/12/2015 | General Payment<br>ID: 4CX56714BN9713101 | Arush Patel | −720.00 | 0.00 | −720.00 |
| 10/12/2015 | General Payment<br>ID: 14Y40916L8325434A | | −663.76 | 0.00 | −663.76 |
| 11/3/2015 | General Payment<br>ID: 5SU32679MW245351S | | 300.00 | 0.00 | 300.00 |
| 12/9/2015 | Website Payment<br>ID: 86C5971165794431V | | −200.00 | 0.00 | −200.00 |
| 12/10/2015 | General Payment<br>ID: 9WX39787MD7756421 | | 980.00 | 0.00 | 980.00 |
| 12/13/2015 | General Payment<br>ID: 46N43344Y8124221P | | 980.00 | 0.00 | 980.00 |
| 12/15/2015 | General Payment<br>ID: 2RY00451761565207 | | 940.00 | 0.00 | 940.00 |
| 12/16/2015 | General Payment<br>ID: 6CL95652VW635045E | | 1,450.00 | 0.00 | 1,450.00 |
| 12/20/2015 | General Withdrawal - Bank Account<br>ID: 8LY65054AK1122403 | | −5,066.24 | 0.00 | −5,066.24 |



Merchant Account ID: ███████████        PayPal ID: johnbauch███████████        1/1/2015 - 12/31/2015

## Transaction History - USD

| Date | Description | Name \ Email | Gross | Fee | Net |
|------|-------------|--------------|-------|-----|-----|
| 12/24/2015 | Payment Refund<br>ID: 4KA90165EL087692D | ███████████ | 200.00 | 0.00 | 200.00 |
| 12/27/2015 | General Currency Conversion<br>ID: 01717304NL232941P | | 49.36 | 0.00 | 49.36 |

## Transaction History - CAD

| Date | Description | Name \ Email | Gross | Fee | Net |
|------|-------------|--------------|-------|-----|-----|
| 2/9/2015 | General Credit Card Deposit<br>ID: 7W080939FB606704B | | 119.00 | 0.00 | 119.00 |
| 2/9/2015 | Website Payment<br>ID: 1M9170788X160443R | ███████████ | -119.00 | 0.00 | -119.00 |
| 2/9/2015 | General Credit Card Deposit<br>ID: 24J70152H83437509 | | 129.00 | 0.00 | 129.00 |
| 2/9/2015 | Website Payment<br>ID: 0B369008WY4487356 | ███████████ | -129.00 | 0.00 | -129.00 |
| 2/13/2015 | Payment Refund<br>ID: 55P081434X956535T | ███████████ | 20.00 | 0.00 | 20.00 |
| 2/13/2015 | General Credit Card Withdrawal<br>ID: 28J08036N3831732B | | -20.00 | 0.00 | -20.00 |
| 12/27/2015 | General Payment<br>ID: 3XH50085GC862661H | ███████████ | 70.00 | 0.00 | 70.00 |
| 12/27/2015 | General Currency Conversion<br>ID: 4VS85107X33377306 | | -70.00 | 0.00 | -70.00 |

To report an unauthorized transaction or other error NOT involving your debit card: call (402-938-3614) or write to us (Attn: Error Resolution Department, P.O. Box 45950, Omaha, NE 68145-0950).

To report an unauthorized transaction or other error concerning your debit card: call (402-938-3614), fax (303-395-2855) or write to us (PayPal Debit Card Department, P.O. Box 45950, Omaha, NE 68145-0950).

To cancel a pre-authorized or recurring payment or determine whether a pre-authorized or recurring transfer has been made: call us at 1-877-896-6383 (please note that only calls pertaining to pre-authorized or recurring payments will be accepted at this number).

# EXHIBIT 7

1 | ERIC H. HOLDER
Attorney General

2

JOSEPH P. RUSSONIELLO (Cal. State Bar No. 44332)
3 | United States Attorney
BRIAN J. STRETCH (Cal. State Bar No. 163973)
4 | Assistant United States Attorney
Chief, Criminal Division

5

TRACIE L. BROWN (Cal. State Bar No. 184339)
6 | JEFFREY R. FINIGAN (Cal. State Bar No. 168285)
Assistant United States Attorneys
7 | White Collar Crimes Section
    Philip Burton Federal Building
8 |     450 Golden Gate Avenue, 11th Floor
    San Francisco, California 94102
9 |     Telephone: (415) 436-7200
    Facsimile: (415) 436-7234
10 |     E-mail: tracie.brown@usdoj.gov
             jeffrey.finigan@usdoj.gov

11

Attorneys for Plaintiff
12 | UNITED STATES OF AMERICA

13

              UNITED STATES DISTRICT COURT
14

          FOR THE CENTRAL DISTRICT OF CALIFORNIA
15

16

UNITED STATES OF AMERICA,    ) No. SA CR 10-00046 AG
17 |                    )
            Plaintiff,  ) DECLARATION OF FRANK L. QUIGLEY
18 |                    )
      v.              )
19 |                    )
PETER H. NORELL, JR.,      )
20 |                    )
         Defendant.  )
21 |                    )
                   )

22

23 |     I, FRANK L. QUIGLEY, hereby declare as follows:

24 |     Background.

25 |     1.   I am a Special Agent with the Department of Justice –

26 | Office of the Inspector General (DOJ-OIG). I have been a Special

27 | Agent with DOJ-OIG for 5 years. Prior to joining DOJ-OIG, I was

28

DECL. OF F. QUIGLEY
SA CR 10-00046 AG

1   with the Secret Service for 23 years, retiring as the Resident
2   Agent in Charge of the Ventura office.  Prior to joining the
3   Secret Service, I spent five years as an agent with the Bureau of
4   Alcohol, Tobacco, Firearms and Explosives.  I am one of the DOJ-
5   OIG Agents involved in the investigation of Defendant Peter
6   Norell, formerly a Special Agent with the FBI.

7       2.    When DOJ-OIG conducts an investigation of an employee,
8   its policy is not to inform the employing agency of any results
9   of its investigation until the investigation is completed and a
10  decision has been made as to whether or not to prosecute.  Thus,
11  DOJ-OIG did not at any time inform Defendant Norell's FBI
12  supervisors of the facts set forth in the Information, plea
13  agreement, this Declaration, and the documents attached hereto.
14  Based on my experience, even if Norell were not criminally
15  prosecuted, his conduct in this matter would likely have resulted
16  in his termination from the FBI.

17      3.    DOJ-OIG's investigation of Defendant Norell commenced
18  in approximately November 2005, when DOJ-OIG learned of an
19  allegation that Norell had misused his authority in connection
20  with an individual known for purposes of these proceedings as
21  "T.S."  The FBI referred this investigation to DOJ-OIG when T.S.
22  complained of Defendant Norell's conduct to another FBI agent.

23      4.    During the course of DOJ-OIG's investigation into
24  Defendant Norell's conduct toward T.S., DOJ-OIG also learned of
25  an allegation that Norell had misused his authority with respect
26  to an individual named Earl Takefman.

27  ///

28
    DECL. OF F. QUIGLEY
    SA CR 10-00046 AG              2

1      Records Review.

2      5.   In connection with the investigation into the

3   allegations regarding T.S. and Earl Takefman, my colleagues and I

4   reviewed phone records, employment records, taped conversations,

5   and computer access records.

6      6.   Review of those records revealed that Defendant Norell

7   had queried the FBI's Automated Computer System (ACS)database for

8   both T.S. and Earl Takefman.  ACS records show that on August 23,

9   August 29, and September 2, 2005, Defendant Norell searched ACS

10  for information regarding T.S.  ACS records further show that on

11  June 21, 2006, Defendant Norell accessed ACS and searched for

12  "Earl Pakefman."

13      7.   In addition, phone records reveal that Defendant Norell

14  used his FBI-issued cellular phone and FBI desk phone to make

15  multiple calls to T.S. in September and October 2005.  Phone

16  records also confirm that Defendant Norell used his FBI-issued

17  cellular phone to call Earl Takefman on June 22, 2006.

18      Interview of Defendant Norell.

19      8.   I was one of the DOJ-OIG Agents who interviewed

20  Defendant Norell on September 28, 2006.  Attached hereto as

21  Exhibit A is a true and correct copy of DOJ-OIG's Memorandum of

22  Investigation regarding that interview, with certain names

23  redacted.  On May 28, 2010, I executed a version of this

24  Declaration in which I stated that I had reviewed the Memorandum

25  of Investigation and found it accurate in all respects.  Since

26  then, I have reviewed my notes of the Defendant's interview.  My

27  notes reflect that the Defendant did not recall admonishing T.S.

28  to answer the door more quickly, while the Memorandum of

DECL. OF F. QUIGLEY
SA CR 10-00046 AG                3

1  Investigation (prepared by another agent who witnessed the
2  Defendant's interview) states that the Defendant admonished T.S.
3  for failing to move more quickly in responding to knocking from
4  the FBI. When I signed the earlier version of this Declaration,
5  I did not remember the Defendant's failure to recall admonishing
6  T.S. I do not have an independent recollection of the
7  Defendant's statement on this point, but must assume that my
8  contemporaneous notes were correct. With that exception, my
9  notes and memory are consistent with the attached Memorandum of
10 Interview.

11      9.   As set forth in more detail in the attached Memorandum
12 of Investigation, Defendant Norell admitted misusing his position
13 with respect to both T.S. and Earl Takefman. Defendant Norell
14 admitted that he went to T.S.'s house with R.L., identified
15 himself as an FBI agent (displaying both his gun and his FBI
16 badge), and told T.S. that he (Norell) would open up an FBI
17 investigation against T.S. unless T.S. paid back the money
18 allegedly owed to R.L. He followed up that visit to T.S.'s home
19 with phone calls making the same threat to open an FBI
20 investigation unless T.S. paid back R.L.

21      10.  Defendant Norell further admitted that he contacted
22 Earl Takefman on behalf of professional golfer Greg Norman,
23 identified himself as an FBI agent, and told Takefman something
24 to the effect of, "You need to watch what you are saying."
25 Defendant Norell admitted that he told Takefman that his effort
26 to contact Greg Norman's then-wife regarding the Normans' divorce
27 might constitute fraud.

28      11.  Defendant Norell further admitted that he was not
   DECL. OF F. QUIGLEY
   SA CR 10-00046 AG              4

1 | truthful with FBI Special Agent In Charge (SAC) Herb Brown when
2 | SAC Brown contacted him regarding Takefman, in that Norell
3 | inaccurately described his call to Takefman by failing to
4 | disclose to SAC Brown that there was no legitimate FBI interest
5 | in Takefman.

6 |     12. At the end of his interview with DOJ-OIG, Defendant
7 | Norell admitted that his actions toward T.S. and Earl Takefman
8 | were wrong. Indeed, he asked us how the process would work when
9 | it came time for his arrest.

10 |     13. Before making these admissions, however, as set forth
11 | in more detail in the attached Memorandum of Interview, Defendant
12 | Norell lied to DOJ-OIG agents multiple times, about the following
13 | matters: (1) whether he had ever accessed an FBI computerized
14 | database regarding T.S., (2) whether he had ever accessed an FBI
15 | computerized database regarding Earl Takefman, (3) whether he
16 | even knew Takefman's last name, and (4) whether he had ever used
17 | his position as an FBI agent to do another favor like he had for
18 | Greg Norman. Defendant Norell admitted the truth regarding his
19 | computer access and his actions toward T.S. only after being
20 | confronted with the facts known to DOJ-OIG as a result of its
21 | investigation.

22 |     <u>Recorded Conversations</u>.

23 |     14. After Defendant Norell contacted T.S. at T.S.'s home on
24 | the morning of September 16, 2005, T.S. surreptitiously recorded
25 | two subsequent phone calls with Defendant Norell. DOJ-OIG
26 | received these recordings and had them transcribed; the
27 | transcriptions have been reviewed for accuracy by T.S. Attached
28 | hereto as Exhibit B are true and correct copies of the

DECL. OF F. QUIGLEY
SA CR 10-00046 AG       5

1 | transcripts of the recorded phone calls between Defendant Norell
2 | and T.S., with certain names redacted.
3 |      I swear under penalty of perjury that the foregoing is true
4 | and correct.  Executed this 4 th day of ~~May~~, at Glendale,
5 | California.

FRANK L. QUIGLEY

DECL. OF F. QUIGLEY
SA CR 10-00046 AG                    6

1  ERIC H. HOLDER
   Attorney General
2
   JOSEPH P. RUSSONIELLO
3  United States Attorney
   BRIAN J. STRETCH
4  Assistant United States Attorney
   Chief, Criminal Division
5
   TRACIE L. BROWN (Cal. State Bar No. 184339)
6  JEFFREY R. FINIGAN (Cal. State Bar No. 168285)
   Assistant United States Attorneys
7  White Collar Crimes Section
        Philip Burton Federal Building
8       450 Golden Gate Avenue, 11th Floor
        San Francisco, California 94102
9       Telephone: (415) 436-7200
        Facsimile: (415) 436-7234
10      E-mail: tracie.brown@usdoj.gov
                jeffrey.finigan@usdoj.gov
11
   Attorneys for Plaintiff
12 UNITED STATES OF AMERICA

13
                 UNITED STATES DISTRICT COURT
14
            FOR THE CENTRAL DISTRICT OF CALIFORNIA
15

16 UNITED STATES OF AMERICA,      ) No. SA CR 10-00046 AG
                                   )
17               Plaintiff,        ) DECLARATION OF EARL TAKEFMAN
                                   )
18        v.                       )
                                   )
19 PETER H. NORELL, JR.,           )
                                   )
20            Defendant.           )
                                   )
21 _____ )

22

23      I, EARL TAKEFMAN, hereby declare as follows:

24      1.   I am a citizen of Canada and a resident of both Miami,

25 Florida, and Montreal, Canada.  I am a former business partner of

26 professional golfer Greg Norman, and have had many dealings with

27 Norman's business manager, Bart Collins.

28
   DECL. OF E. TAKEFMAN
   SA CR 10-00046 AG

1     2.   It is my understanding from Greg Norman's former
2 business manager that Defendant Peter Norell is a very good
3 friend of Sandy Lang, who is a friend of Greg Norman's.

4     3.   In May 2006, I attempted to contact Laura Norman, a
5 friend of mine, because I had heard in the newspapers that she
6 and Greg Norman were divorcing. I contacted her lawyer to find
7 out if certain information I had heard about Greg Norman could
8 help her in the divorce proceedings. Neither the information I
9 planned to provide to Laura Norman (which was on a personal
10 matter relating to the Normans' marriage), nor my prior business
11 dealings with Greg Norman, had any connection to the Los Angeles
12 area.

13     4.   It is my understanding that Greg Norman, Bart Collins,
14 and Sandy Lang became aware of my effort to contact Laura Norman
15 regarding the Normans' divorce proceedings. Bart Collins in fact
16 called me to ask me not to talk to Laura Norman.

17     5.   It is my understanding that when Sandy Lang learned
18 that Greg Norman was upset with my attempt to contact Laura
19 Norman, he (Lang) contacted Greg Norman and Bart Collins, and
20 offered to have Defendant Norell intervene. It is further my
21 understanding that Greg Norman and Bart Collins agreed to have
22 Defendant Norell contact me in an effort to stop me from speaking
23 to Laura Norman about the Normans' divorce.

24     6.   On June 22, 2006, I received a phone call from
25 Defendant Norell, who identified himself as an FBI agent calling
26 on behalf of Greg Norman, Sandy Lang, and Bart Collins.

27     7.   After I asked the reason for his call, Defendant Norell

28 DECL. OF E. TAKEFMAN
SA CR 1C-00046 AG         2

1 told me that I had "crossed the line," and that it would be best
2 if I "shut [my] mouth" in the future. When I asked Defendant
3 Norell what he was talking about, he said I knew what he was
4 talking about and reiterated that I should "keep [my] mouth
5 shut."

6     8.   I then inquired whether Norell's call related to Laura
7 Norman. Defendant Norell again stated that I had "crossed the
8 line," and threatened that my conduct could result in criminal
9 fraud or extortion charges. Defendant Norell's tone throughout
10 this phone call was threatening and aggressive.

11     9.   I told Defendant Norell he should be ashamed of
12 himself, and immediately contacted the FBI in Los Angeles using a
13 number he gave to me. I followed up my phone call to the FBI
14 with an e-mail and letter to J. Stephen Tidwell, whom I
15 understood to be the Assistant Director in Charge (ADIC) of the
16 FBI in Los Angeles. Attached hereto as Exhibit A is a true and
17 correct copy of my June 22, 2006 letter to ADIC Tidwell, with my
18 telephone number and address redacted.

19     10. After consulting with my attorney, I sent a second
20 letter to ADIC Tidwell. Attached hereto as Exhibit B is a true
21 and correct copy of my June 23, 2006 letter to ADIC Tidwell, with
22 my telephone number and address redacted.

23     11. As stated in those letters, based on the tone and
24 content of Defendant Norell's threats, I feared the possibility
25 of bodily harm, continued harassment, and/or reprisal from
26 Defendant Norell in connection with my travels between Canada and
27 the United States.

28

DECL. OF E. LAKEFMAN
SA CR 10-00046 AG            3



```
 1        12.  I believe that Defendant Norell's conduct toward me was
 2   egregious in that he had essentially agreed to act as an agent
 3   for Greg Norman in his divorce proceedings in an attempt to
 4   affect the result of the proceedings.  Moreover, in addition to
 5   being threatening, his conduct toward me was obviously
 6   unprofessional for an agent of the FBI.
 7
 8        I swear under penalty of perjury that the foregoing is true
 9   and correct.  Executed this 28th day of May, at Montreal,
10   Quebec, Canada.
11
12
13                              EARL TAKEFMAN
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
     DECL. OF E. TAKEFMAN
     SA CR 10-C0046 AG              4
```

# EXHIBIT 8

*Coastal 1031, Inc.*
999 Corporate Dr., Suite 100
Ladera Ranch, CA 92694
Phone: (949) 492-6280    (877) 419-3558 fax

## EXCHANGE AGREEMENT
Accommodator No. **1700**

THIS EXCHANGE AGREEMENT is entered into this **10ᵗʰ** day of **September, 2014,** by and between, **John Joseph Bauche', a single man,** (hereinafter referred to as "EXCHANGOR") and **Coastal 1031, Inc.,** (hereinafter referred to as "Coastal 1031").

WHEREAS, Exchangor desires to sell the Relinquished Property not for cash but rather wishes to exchange it for other like-kind property so that Exchangor does not recognize gain as permitted under Section 1031 of the Internal Revenue Code, and

WHEREAS, Coastal 1031 desires to acquire from Exchangor the Relinquished Property;

NOW, THEREFORE, the parties hereto agree to the following:

### SECTION 1    DEFINITIONS
As used in this Agreement, the words and phrases shown below are defined as follows:

**1.1    Conveyance Date:** In respect to the relinquished property, the date of recording of either the deed conveying such property to Coastal 1031 or of the deed from Exchangor directly to the Buyer in the sale escrow; and in respect to the replacement property, the date of recording of the deed conveying such property to Exchangor.

**1.2    Closing Date:** In respect to the exchange, the date on which such exchange is completed and all accounts between Coastal 1031 and Exchangor with respect to such exchange are settled as provided in Section 3.4 below.

### 1.3 Exchange Value:
a) In respect to the relinquished property; "Exchange Value" shall mean **$310,000.00.** All escrow fees, real estate commission, prorations, closing costs or any other amounts chargeable to the seller of the relinquished property under the sale escrow, not taken into account when determining the exchange value of the relinquished property, shall be charged to Coastal 1031 and shall reduce the exchange value of the relinquished property accordingly.

b) In respect to the replacement property; "Exchange Value" shall mean the total costs incurred by Coastal 1031 in connection with the acquisition of the replacement property and the conveyance thereof to Exchangor, including, but not limited to, all amounts expended by Coastal 1031 in the payment of the purchase price, loan fees, real estate broker's commission, Coastal 1031's share of prorated income and expenses (including rents, interest and insurance premiums), recording fees, escrow fees and title insurance premiums but specifically excluding deeds of trust, mortgages and new loans obtained which are assumed or taken subject to by Exchangor.

**1.4    Sale Escrow:** That certain **Escrow No.** ▆▆▆▆▆ being handled by **Deanna** ▆▆▆▆▆ Escrow Officer at **Whatcom Land Title Company, 2011 Young Street, Bellingham, WA 98226**

**1.5    Relinquished Property:** The real property (including improvements located thereon) the description of which is as follows: **7451 Birch Bay Drive, Blaine, WA 98230**

**1.6    Replacement Property:**    The parcel or parcels of real property, together with any

---

Coastal 1031                                                                                    Page 1 of 10

appurtenances thereto or improvements thereon, owned or hereafter acquired by Coastal 1031 which will be conveyed to Exchangor in exchange for the relinquished property.

## SECTION 2      CONVEYANCE OF THE RELINQUISHED PROPERTY

**2.1      Agreement to Exchange:**  Exchangor agrees to convey the relinquished property to Coastal 1031 upon the terms and conditions set forth herein and Coastal 1031 agrees, in exchange therefor, to convey to Exchangor upon the terms and conditions set forth in Section 3 below, replacement property having an aggregate exchange value equal to the exchange value of the relinquished property as determined in Section 1.3a.

**2.2      Conveyance of Interest in the Relinquished Property:**  Exchangor shall convey the relinquished property to Coastal 1031 by delivering to Coastal 1031, on or before the closing date of the sale escrow, a warranty deed conveying said interest to Coastal 1031, however, at the exclusive discretion of Coastal 1031, it may direct that Exchangor convey the property directly to the purchaser in the sale escrow.  The parties agree that Coastal 1031 shall be furnished all documents and information necessary for Coastal 1031 to perform its obligations under this Agreement.

**2.3      Accounting and Growth Factor:**  In order to properly account for the Exchange Value in respect to the Relinquished Property, Coastal 1031 shall establish a credit balance on Coastal 1031's books and records (hereinafter referred to as "Exchange Account") in favor of Exchangor.  The opening entry for this account shall be equal to the Exchange Value of the Relinquished Property, less Coastal 1031's set-up fees.  Thereafter, the balance of the Exchange Account shall be reduced from time to time by (a) the Exchange Value of the Replacement Property, and (b) any other costs or expenses incurred by Coastal 1031 for which Exchangor is obligated or responsible hereunder.

## SECTION 3      CONVEYANCE OF PROPERTY TO EXCHANGOR

**3.1      Acquisition of Replacement Property:**  Within forty-five (45) days of the Conveyance Date, Exchangor shall identify and request Coastal 1031 to acquire one or more parcels of Replacement Property from time to time by delivering to Coastal 1031 a written notice describing each parcel of Replacement Property.  Concurrently therewith, or immediately thereafter, a proposed purchase agreement and/or escrow instructions for the purchase of said Replacement Property (hereinafter referred to collectively as the "Purchase Escrow Instructions") shall be deposited with Coastal 1031 with a request that Coastal 1031 execute the same as buyer.  Said request shall be delivered to Coastal 1031 not less than ten (10) business days prior to the date execution is desired.  Upon delivery of the Purchase Escrow Instructions by Exchangor to Coastal 1031, Exchangor shall be deemed to have approved same, and all instruments related thereto.  Provided the form and content of the Purchase Escrow Instructions and instruments to be executed in connection therewith are approved by Coastal 1031, in its reasonable discretion, and such instructions and instruments comply with the terms and conditions of this Agreement, Coastal 1031 shall sign and deliver the Purchase Escrow instructions and shall acquire the Replacement Property pursuant thereto. The cash consideration required to be given by Coastal 1031 to the seller of any Replacement Property (exclusive of the aggregate amount of liens encumbering the Replacement Property with respect to which Coastal 1031 will take subject to and any Note(s) to be given by Coastal 1031 to the seller of any Replacement Property) plus the aggregate of all other costs included within the Exchange Value of such Replacement Property shall not exceed an amount equal to the then balance of the Exchange Account, unless such excess amount has first been delivered in collected funds to Coastal 1031 by Exchangor with written instructions from Exchangor that Coastal 1031 is to use such additional funds to acquire the Replacement Property. Coastal 1031 shall not be obligated to execute any Purchase Agreement, Promissory Note(s), Deed(s) of Trust or other

security instrument, nor any Lease or otherwise undertake any other obligation or liability whatsoever in connection with the acquisition of the Replacement Property, unless Coastal 1031 has first obtained, in form acceptable to Coastal 1031, all assurances that it, in its reasonable discretion, deems necessary or desirable, including, without limitation, deposit of any excess funds required, unconditional release and discharge therefrom any indemnification(s) against any liability in connection therewith from all persons specified by Coastal 1031 upon the transfer of such Replacement Property to Exchangor. The parties agree that Coastal 1031 shall be furnished all amounts and information necessary for Coastal 1031 to perform its obligations hereunder.

**3.2    Exchangor's Approval of Terms:**  Subject to the foregoing, Coastal 1031 shall undertake to purchase the designated Replacement Property for not more than the purchase price, and upon such other terms and conditions specified by Exchangor and accepted by Coastal 1031; provided, however, that Coastal 1031 shall incur no liability to Exchangor if Coastal 1031's efforts to purchase same on the terms and conditions specified by Exchangor shall be unsuccessful. Coastal 1031 shall not, without the prior written consent of Exchangor, consummate the purchase of any such Replacement Property unless Exchangor has first approved the Physical condition, a current preliminary title report, the purchase price, the terms and conditions upon which such Replacement Property may be purchased, and all legal and other matters relating to the ownership and use thereof. Coastal 1031 shall not be liable to Exchangor for any changes in the status of title to or condition of any Replacement Property which may arise after approval thereof by Exchangor except as provided in Section 3.2.

**3.3    Consummation of Exchange:**    Concurrently with Coastal 1031's acquisition of the Replacement Property, it shall deliver through the Purchase Escrow a Grant Deed conveying the Replacement Property to Exchangor. However, at Coastal 1031's exclusive discretion, Coastal 1031 may direct that the Grantor of the Replacement Property convey directly to Exchangor notwithstanding Coastal 1031's position as buyer under the Purchase Escrow. Coastal 1031 warrants to Exchangor that title to the Replacement Property shall be encumbered only by those easements, liens and other encumbrances which affect the Replacement Property at the time of Coastal 1031's acquisition thereof.

**3.4    Cash Payment by Coastal 1031:**  Exchangor shall provide Coastal 1031 with written notice, no less than seven days, prior to the date of any disbursements required. When the Exchange Account has been reduced to zero by conveyances of Replacement Property, the exchange shall be complete and such date shall be the Closing Date. Exchangor must identify any Replacement Property on or before forty-five (45) days following the Conveyance Date of the Relinquished Property. Coastal 1031 will not accept any identification letters after the 45th day following the Conveyance date of the Relinquished Property.   The Closing Date shall be no later than the 180th day following the Conveyance Date of the Relinquished Property. Should, on the Closing Date, there remain a credit balance in the Exchange Account, Coastal 1031 shall, within 187 days of the Conveyance Date and after written request, make payment by Coastal 1031's check to Exchangor of the remaining credit balance. Under no circumstances shall Exchangor have the right to demand or receive cash in lieu of Replacement Property without notice as above described.

**3.5    Right to Terminate Agreement Early:**  Coastal 1031 shall, at its option, have the right to fully discharge and perform its obligations under this Agreement prior to the Closing Date by payment by Coastal 1031's check to Exchangor of the balance of the Exchange Account the remaining, immediately upon the occurrence of any of the following events:

a)  The commencement by Exchangor of a voluntary case under any Chapter or Section of the Federal Bankruptcy Code or any similar law of the United States or any State pertaining to

bankruptcy; insolvency or debtor relief;

b) The commencement against Exchangor of any involuntary case or other proceeding under any Chapter or Section of the Federal Bankruptcy, insolvency or debtor relief, if such case or proceeding shall not be vacated or set aside within sixty (60) days after such commencement;

c) The issuance by any court of any order relieving, staying or reordering the debts or obligations of Exchangor.

d) The filing by Exchangor of a pleading in any court admitting its inability to pay its debts as they become due;

e) The making by Exchangor of a general assignment for the benefit of its creditors;

f) The appointment for Exchangor of a receiver of trustee for all or substantially all of Exchangor's assets;

g) The occurrence of an attachment, execution or judicial seizure of the rights of Exchangor pursuant to this Agreement;

h) The commencement of any action naming Coastal 1031 as a party, which action relates to any claim concerning the Relinquished Property or any Replacement Property or any transaction relating thereto or alleged liability of Coastal 1031 in connection therewith and Exchangor fails to defend and indemnify Coastal 1031 in connection therewith, with counsel approved by Coastal 1031.

In the event that any provision of the Section is not enforceable under applicable law in any bankruptcy, insolvency or other debtor relief proceeding, Coastal 1031 shall also have the right to terminate its obligations hereunder by payment of the then existing balance of the Exchange Account upon (i) the rejection of disaffirmance of the Paragraph in any such proceeding; or (ii) the failure of Exchangor or any trustee, receiver or other person or entity in possession of Exchangor's property to give adequate assurance that Coastal 1031's obligation hereunder or the manner of performance thereof will not be varied as a result of such proceeding. In the event of any discharge and performance by Coastal 1031 in accordance with the provisions of this Section, the subject to Exchangor's continuing indemnification obligations as set forth in Section 4.3 hereof, this Agreement shall thereupon be terminated without further liability or obligation of either party thereto.

## SECTION 4      COVENANTS, REPRESENTATIONS AND WARRANTIES

**4.1      Risk of Loss:** Exchangor assumes the risk of loss or damage to the Relinquished Property, any Replacement Property and all other property received by Coastal 1031 under this Agreement by casualty or otherwise.

**4.2      No Representation Regarding Section 1031 Treatment:** Exchangor acknowledges and agrees that Coastal 1031 neither warrants nor represents that the exchange transaction contemplated hereby will qualify for tax-deferred exchange treatment pursuant to Section 1031 of the Internal Revenue Code or otherwise. Exchangor and Coastal 1031 agree that the transfer to Coastal 1031 of the Relinquished Property is not conditioned upon qualification of this transaction for such tax deferred exchange treatment, and Exchangor shall convey the Relinquished Property to Coastal 1031 regardless of the ultimate form of payment by Coastal 1031 of the exchange consideration hereby specified, and regardless of the tax treatment of the receipt of that consideration in the hands of

Exchangor.

**4.3    Indemnification by Exchangor:**  Exchangor shall defend and indemnify Coastal 1031, its successors and/or assigns, and hold it harmless from and against all claims, losses, expenses, obligations and liabilities (including costs of litigation and reasonable attorney's fees and expenses) which arise, result from or otherwise relate to:

A. Brokerage commissions or finder's fees with respect to any transaction contemplated by this Agreement and any leasing brokerage commission in connection with leases encumbering any Replacement Property; or

B. The obligations of Exchangor and Coastal 1031 under the Sale Escrow Instructions, the Purchase Escrow Instructions and any other agreements, instructions and documents referred to therein or relating thereto, including without limitation, the obligations, if any, to the buyer of the Relinquished Property or the seller of any Replacement Property or any other claim, obligation or liability arising from or relating to the Relinquished Property or any Replacement Property (including, without limitation, any claim by any lender, tenant, lienor or other third party in connection therewith) except for duties or acts performed by Coastal 1031 negligently or Coastal 1031's willful misconduct; or

C. Coastal 1031's performance of any of its duties or obligations hereof, except for duties or acts performed by Coastal 1031 negligently or Coastal 1031's willful misconduct.  Notwithstanding any other term or provision herein to the contrary, Exchangor's indemnification obligation set forth herein shall survive and remain in effect following the close of any escrow and/or delivery and recording of any Deed pursuant hereto, and/or any termination of this Agreement.

D. Any event or events involving the use, spillage, discharge or cleanup of any hazardous substances, toxic waste, asbestos, PCBs, petroleum products or environmental pollutants in violation of any federal, state or local environmental statutes or ordinances, including, without limitation, violation of the Comprehensive Environmental Response, Compensation and Liability Act, as amended, pertaining to the Relinquished Property or the Replacement Property and any and all liability and cleanup costs (and other associated costs, interest, fees and penalties) incurred by Coastal 1031 as a result of the application of such laws to Coastal 1031.  The warranty shall survive the termination of the agreement and shall not merge into any documents executed in conjunction herewith.

**4.4    Coastal 1031 Not Responsible:**  Coastal 1031 shall not be responsible nor liable for:

A. The sufficiency or correctness as to form or the validity of any document deposited with escrow agents pursuant to the Sale Escrow Instructions or any Purchase Escrow Instructions; or

B. The manner of execution of any such deposited document, unless such execution occurs in Coastal 1031's premises and under its supervision; or

C. The identity, authority or rights of any person executing any such deposited documents; or

D. Any act or omission of Coastal 1031 unless the same shall constitute a willful breach or default or gross negligence by Coastal 1031.

**SECTION 5        COMPENSATION TO COASTAL 1031**
**5.1    Set-Up Fees:**  Coastal 1031 shall deduct from the opening entry of the Exchange Account its Accommodator Fee in the amount of:  **SEVEN HUNDRED FIFTY AND 00/100THS DOLLARS**

**($750.00).**

**5.2    Extraordinary Costs:**  Coastal 1031 shall be entitled to reimbursement for all extraordinary costs expended, including but not limited to, costs for messenger service and/or special mailing costs. Cost for Electronic Funds Transfer shall be $25.00 per incoming or outgoing wire.      Should accommodator be required to withhold and submit funds to the California Franchise Tax Board, the fee shall be $75.00.

## SECTION 6          MISCELLANEOUS PROVISIONS

**6.1    Survival of Warranties:**    The representations, warranties, covenants, agreements and indemnities set forth in or otherwise made pursuant to this Agreement shall survive and remain in effect following the close of any escrow hereunder and the delivery and recording of any Deed pursuant hereto, and shall not be merged therein.

**6.2    Attorney's Fees:**  Should legal action be brought for the enforcement of this Agreement or any term hereof, or due to any alleged dispute, breach, default or misrepresentation in connection with any provision herein contained, the prevailing party shall be entitled to recover reasonable attorney's fees and other costs incurred in any such action or proceeding, in addition to such other relief as may be granted.

**6.3    Entire Agreement:**    This Agreement constitutes the entire agreement between the parties hereto and supersedes all contemporary and previous written or oral agreements, representations and undertakings.  No supplement, modification or amendment to this agreement shall be binding unless executed in writing by all of the parties.  No waiver of any provision of this Agreement shall be deemed as waiver of any other provisions, whether or not similar, nor shall it be binding unless executed in writing by the party making the waiver.

**6.4    Notices:**  Any request, notice or other communication to be given hereunder shall be given in writing and delivered personally or sent by registered or certified mail, return receipt requested, postage prepaid, as follows:

TO EXCHANGOR:    **John Joseph Bauche'**

    **Address:** ▮▮▮▮▮▮▮ ▮▮ ▮▮▮▮▮▮▮▮ ▮▮ ▮▮

    **Home Phone:** ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮    **Office/Cell** ▮▮▮▮▮ ▮▮▮ ▮▮▮▮

    **Email Address(es):** ▮▮▮▮▮▮▮▮▮▮▮

TO COASTAL 1031:        Attn: **Danny**▮▮▮▮▮
                    999 Corporate Dr., Suite 100, Ladera Ranch, CA 92694
                    Phone No. (949) 492-6280    Fax No. (877) 419-3558

        All notices delivered hereunder shall be deemed effective upon receipt if delivered personally and on the third (3rd) day after mailing if sent by mail.

**6.5    Headings:**  Captions of the sections of this Agreement are for convenience only and the words contained therein shall in no way be held to explain, modify, amplify or aid in the interpretation, construction or meaning of the provisions of this Agreement.

**6.6    California Law Governs:**  The validity of this agreement and of any of its terms or provisions, as well as the right and duties of the parties hereunder, shall be interpreted and construed pursuant to and

Exchange Agreement 1700

in accordance with the laws of the State of California.

**6.7   No Assignment:**  No assignment of this Agreement or of any right hereunder or of any duty or obligation of performance hereunder shall be made, in whole or in part, by either party. Notwithstanding the above, Coastal 1031 may assign this Agreement to any of its subsidiaries or affiliates provided nothing herein shall release Coastal 1031 from its obligations hereunder.  Subject to the foregoing, this Agreement shall be binding upon and shall inure to the benefit of each party hereto and its respective heirs, legal representatives, successors and assigns.

**6.8   Additional Documents:**   The parties hereto agree to execute all additional documents necessary to carry out the terms and provisions of this Agreement.

**6.9   Counterparts:**  This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, and said counterparts shall constitute but one and the same instrument which may be sufficiently evidenced by one counterpart.  The fact that this Agreement may have been executed at different times by different parties shall not affect its validity.

**7.0   Acknowledgements:**

1. I/We hereby acknowledge that the above listed contact information and taxpayer identification information has been obtained by the undersigned and confirmed by my/our legal counsel and/or tax accountant independent of the "Accommodator".

2. I/We must identify a replacement property within 45 days of the transfer of the "Downleg" property;

3. I/We must close the "Up-Leg" escrow within 180 days after the transfer of the "Downleg" property **or the due date of the tax return, whichever occurs first**;

4. I/We have the option of receiving interest on the equity proceeds during the exchange period.

5. I/We must receive any taxable cash boot directly from the Relinquished Property escrow before proceeds are transferred to Coastal 1031.  Once funds are deposited with Coastal 1031, receiving funds during the exchange period may invalidate my exchange.

6. I/We will provide Taxpayer Identification Number(s) upon request.

### IN WITNESS WHEREOF, THE PARTIES HAVE EXECUTED THIS AGREEMENT.

**Exchangor**

DocuSigned by:

*John Joseph Bauché*

By: 1A5AA... **John Joseph Bauche'**

**Coastal 1031**, Inc.

DocuSigned by:

By: *Daniel*

7D... **Danny**

### Exchange Agreement 1700

**Whatcom Land Title Company**
**Attn: Deanna** ▮
**2011 Young Street, Bellingham, WA 98226**

Date:
Escrow No: ▮
Accommodator #: 1700

### Downleg Amendment 1700

My previous instructions to you are hereby modified/supplemented in the following particulars only.

1.     Escrow holder is hereby notified that, pursuant to the original Residential Real Estate Sales Contract dated   **August 31, 2014**, **John Joseph Bauche',** hereinafter referred to as Assignor, shall delay in selecting property with which to create an exchange.  Assignor hereby assigns all of their right, title and interest in and to this escrow to Coastal 1031, Inc., hereinafter referred to as Assignee, and said Assignee, with its signature hereunder, accepts said assignment and will complete the sale transaction pursuant to the terms and conditions of this escrow.

2.     Escrow holder is further instructed to prepare a General Warranty Deed or Special Warranty Deed from Assignor in favor of the Buyer in the above referenced escrow, herein after referred to as Buyer.

3.     It is the intent of Assignor that this transaction qualify as a tax-deferred exchange under Section 1031 of the Internal Revenue Code.  Buyer shall cooperate to help Assignor effect such an exchange, provided that the term of this transaction shall not be affected and that Buyer shall not be at any additional expense.

4.     Assignee is acting on behalf of Assignor in completing a delayed Internal Revenue Code Section 1031 tax deferred exchange under a separate exchange agreement dated **September 10, 2014**, which was prepared and executed prior to and outside of this closing.

5.     This escrow has been structured in accordance with instructions given to escrow holder by the parties herein, and all parties acknowledge they have been advised to seek counsel of their own tax attorney or certified public accountant for the determination of any tax consequences of this transaction and therefore indemnify and hold escrow holder harmless from any loss which said party may sustain in the event this transaction is audited by the Internal Revenue Service and disallowed as a 1031 transaction.

6.     INDEMNIFICATION:  AS AN AGREEMENT BETWEEN THE PARTIES HERETO WITH WHICH ESCROW HOLDER IS NOT TO BE CONCERNED NOR LIABLE, Assignor hereby acknowledges that Assignee has never inspected subject property, and Assignee assumes no responsibility therefore.  Assignor indemnifies and holds Assignee harmless from any and all obligations, warranties, (expressed or implied) or representations which Assignee will be conveying title to Buyer.

7.     If any rights, duties, obligations, warranties or representations, expressed or implied, run in favor of Assignor or Buyer, both warrant they will look only to the other for satisfaction of any right, duty, obligation, warranty or representation and warrant they will not look to, nor involve in any way, Assignee in any dispute each may have with the other.

8.     If any litigation is commenced by a third party which names Assignee as a party, whether Assignor and/or Buyer is also named, or even if they are not named, Assignor shall pay all costs and attorney's fees incurred by Assignee, without limitation.  If either Assignor or Buyer names Assignee in litigation, that party shall pay all costs and fees incurred by Assignee, without limitation, including attorney's fees.

9.     Escrow holder is further advised that the use of the words "Buyer" and "Seller", or any reference to the "sale" or "resale" of subject property were used for the purpose of identification only and to distinguish between the parties and not to describe the transaction.

**Exchange Agreement 1700**

10.     Each of the undersigned states that he has read the foregoing instructions and understands and agrees to them.

11.     The representations and warranties contained herein shall survive the close of escrow.

12.     Any refunds received after the close of escrow for the account of the Assignor shall be made payable to the Assignee.

13.     Assignor hereby instructs Escrow Holder to disburse the sum of $ 0.00 _____ in taxable boot directly to Assignor at the close of escrow, prior to transferring assignor's exchange proceeds to Assignee. State Withholding requirements may apply.

14.     EACH OF THE UNDERSIGNED STATES THEY HAVE READ THE FOREGOING INSTRUCTIONS AND UNDERSTAND THEM AND ACKNOWLEDGE RECEIPT OF A COPY THEREOF.

ASSIGNOR:

*John Joseph Bauché*
By: John Joseph Bauche'

The undersigned Assignee acknowledges receipt of a copy of the original Escrow Instructions and any amendments thereto and will comply with the terms and conditions thereof.

ASSIGNEE:

**Coastal 1031, Inc.**

BY: *Daniel Kirkham*
Danny

The undersigned acknowledges the above and, subject to the terms of our escrow, shall cooperate as described herein.

BUYER:

By:_____          By:_____
        Randy                                       Margaret